FILED ___ LODGED ✓
RECEIVED ___ COPY

JUL 1 4 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

SEALED

GREGORY A. ASHE (VA Bar No. 39131)
BENJAMIN R. CADY (NY Bar No. 5133582)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20850
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-2939 (Cady)
Email: gashe@ftc.gov, bcady@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Federal Trade Commission,** | CASE NO.   **CV25-02443-PHX-SMB** |
| Plaintiff, | |
| V. | **MEMORANDUM IN SUPPORT OF THE FTC'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| **Accelerated Debt Settlement Inc.,** et al., | |
| Defendants. | **DOCUMENT SUBMITTED UNDER SEAL** |

i

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   THE PARTIES .................................................................................................... 2

      A. Federal Trade Commission ........................................................................ 2

      B. Defendants ................................................................................................. 3

III.  DEFENDANTS' UNLAWFUL BUSINESS PRACTICES ..................................... 9

      A. Defendants Make False and Misleading Representations to Market Their Debt
         Relief Services ........................................................................................... 9

         1.  Phase 1 and Phase 2:  Defendants Falsely Impersonate Businesses and the
             Government ...................................................................................... 14

         2.  Phase 3—The Deceptive Enrollment Pitch:  Defendants Make False
             Promises about Their Debt Relief Services ....................................... 21

         3.  Defendants Do Not Provide the Promised Debt Relief Services ............... 32

      B. Defendants' Collection of Illegal Advance Fees ............................................. 37

      C. Defendants Unlawfully Use Remotely Created Checks ..................................... 43

      D. Defendants Unlawfully Obtain Consumers' Credit Reports ............................ 44

      E. Defendants Violate the TSR's Do Not Call Provisions ..................................... 47

      F. Defendants' Unlawful Practices Have Bilked Over a Hundred Million Dollars
         from Consumers ............................................................................................ 48

IV.   A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST
      DEFENDANTS .................................................................................................... 50

      A. This Court Has the Authority to Grant the Requested Relief ............................. 50

      B. The FTC Meets the Standard for Preliminary Injunctive Relief ...................... 53

1    1. The FTC Is Likely to Succeed on the Merits ................................................ 53

2    2. Irreparable Harm Exists .............................................................................. 54

3

4    3. The Equities Weigh in Favor of Granting Injunctive Relief....................... 55

5    4. The Public Interest Weighs in Favor of Injunctive Relief .......................... 56

6

7    C. Defendants Are a Common Enterprise and Jointly and Severally Liable for the
     Law Violations................................................................................................ 57

8

9    D. The Individual Defendants Are Liable for Injunctive and Monetary
     Relief .............................................................................................................. 58

10

11   V.   THE SCOPE OF THE PROPOSED *EX PARTE* TRO IS NECESSARY AND
          APPROPRIATE ................................................................................................ 60

12

13   A. Conduct Relief Is Necessary to Stop Ongoing Consumer Harm..................... 61

14   B. Asset Preservation Is Necessary to Preserve the Possibility of
        Final Relief..................................................................................................... 61

15

16   C. A Receiver Is Necessary to Prevent Further Consumer Harm and Locate and
        Preserve Business Assets and Records ............................................................ 64

17

18   D. Immediate Access and Limited Expedited Discovery Are Appropriate .......... 65

19   E. The TRO Should Be Issued Without Notice to Defendants to Preserve the
        Court's Ability to Fashion Meaningful Relief.................................................. 67

20

21   VI.  CONCLUSION ................................................................................................ 69

22

23

24

25

26

27

28

iii

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

4

*AMG Capital Mgmt., LLC v. FTC*,
   593 U.S. 67 (2021) ................................................................................ 52

5

*AT&T Broadband v. Tech Commc'ns.*,
6
   381 F.3d 1309 (11th Cir. 2004)............................................................ 67

7

*Blasi v. United Debt Servs. LLC*,
8
   2014 U.S. Dist. LEXIS 206248 (S.D. Ohio Nov. 5, 2014) .................... 47

9

*Boardman v. Pac. Seafood Grp.*,
10
   822 F.3d 1011 (9th Cir. 2016)............................................................... 53

11

*Cenergy Corp. v. Bryson Oil & Gas P.L.C.*,
12
   657 F. Supp. 867 (D. Nev. 1987) .......................................................... 67

13

*CFPB v. Chou Team Realty LLC*,
14
   2021 U.S. Dist. LEXIS 207126 (C.D. Cal. Apr. 27, 2021).................... 47

15

*CFPB v. Nesheiwat*,
16
   2022 U.S. App. LEXIS 35633 (9th Cir. Dec. 27, 2022) ........................ 47

17

*CFTC v. British Am. Commodity Options Corp.*,
18
   560 F.2d 135 (2d Cir. 1977)............................................................ 55, 56

19

*City of New York v. Golden Feather Smoke Shop, Inc.*,
20
   597 F.3d 115 (2d Cir. 2010).................................................................. 54

21

*In re Cliffdale Assocs., Inc.*,
22
   103 F.T.C. 110 (F.T.C. 1984).................................................................. 9

23

*Curtis Lumber Co. v. La. Pac. Corp.*,
24
   618 F.3d 762 (8th Cir. 2010)................................................................. 11

25

*Deckert v. Indep. Shares Corp.*,
26
   311 U.S. 282 (1940) .............................................................................. 62

27

*Del. Watch Co. v. FTC*,
28
   332 F.2d 745 (2d Cir. 1964).................................................................. 58

iv

*Fed. Express Corp. v. Fed. Espresso, Inc.,*
    1997 U.S. Dist. LEXIS 19144 (N.D.N.Y. Nov. 24, 1997)...................................... 66

*First Tech. Safety Sys., Inc. v. Depinet,*
    11 F.3d 641 (6th Cir. 1993)................................................................................. 67

*Flynt Distrib. Co. Inc. v. Harvey,*
    734 F.2d 1389 (9th Cir. 1984)............................................................................. 54

*FSLIC v. Dixon,*
    835 F.2d 554 (5th Cir. 1987)............................................................................... 66

*FTC v. Absolute Fin. Servs.,*
    2020 U.S. Dist. LEXIS 260869 (D.S.C. Jul. 17, 2020).......................................... 56

*FTC v. Affordable Media, LLC,*
    179 F.3d 1228 (9th Cir. 1999)......................................................... 52, 53, 59, 60, 61

*FTC v. AMG Servs.,*
    2017 U.S. Dist. LEXIS 66689 (D. Nev. May 1, 2017) ........................ 10, 11, 57, 58

*FTC v. Am. Vehicle Prot. Corp.,*
    2022 WL 14638465 (S.D. Fla. Oct. 25, 2022)....................................................... 51

*FTC v. Amy Travel Serv. Inc.,*
    875 F.2d 564 (7th Cir. 1989), *overruled on other grounds by FTC v. Credit
    Bureau Ctr., LLC,* 937 F.3d 764, 767 (7th Cir. 2019) ...................................... 59, 60

*FTC v. Automators LLC,*
    2023 U.S. Dist. LEXIS 150791 (S.D. Cal. Aug. 25, 2023) ................................... 52

*FTC v. BCO Consulting Servs., Inc.,*
    2023 U.S. Dist. LEXIS 114437 (C.D. Cal. May 22, 2023)..................................... 52

*FTC v. Campbell Cap. LLC,*
    2018 U.S. Dist. LEXIS 186728 (W.D.N.Y. Oct. 24, 2018)..................................... 56

*FTC v. City West Advantage, Inc.,*
    2008 WL 2844696 (D. Nev. Jul. 22, 2008)........................................................... 53

v

*FTC v. Com. Planet,*
    815 F.3d 593 (9th Cir. 2016)..................................................................... 60

*FTC v. Connelly,*
    2006 U.S. Dist. LEXIS 98263 (C.D. Cal. Dec. 20, 2006) ....................................... 36

*FTC v. Consumer Def., LLC,*
    926 F.3d 1208 (9th Cir. 2019)......................................................................... 53, 54

*FTC v. Consumer Health Benefits Ass'n,*
    2011 U.S. Dist. LEXIS 92389 (E.D.N.Y. Aug. 18, 2011) ....................................... 58

*FTC v. Cyberspace.com LLC,*
    453 F.3d 1196 (9th Cir. 2006)..................................................................... 9, 10, 11

*FTC v. D Squared Sols., LLC,*
    2003 WL 22881377 (D. Md. Oct. 30, 2003)............................................................ 64

*FTC v. Data Med. Cap., Inc.,*
    2010 U.S. Dist. LEXIS 3344 (C.D. Cal. Jan. 15, 2010)......................................... 10

*FTC v. Ecological Fox, LLC,*
    Case No. 1:18-cv-03309-PJM (D. Md. Nov. 5, 2018)............................................ 67

*FTC et al. v. Educare Centre Servs. Inc.,*
    2020 U.S. Dist. LEXIS 135341 (W.D. Tex. Apr. 3, 2020)..................................... 56

*FTC v. Elegant Sols.,*
    2022 WL 2072735 (9th Cir. June 9, 2022) ..................................................... 52, 59

*FTC v. Elegant Sols.,*
    2020 WL 4390381 (C.D. Cal. July 6, 2020) ................................................... 10, 57

*FTC v. Evans Prod. Co.,*
    775 F.2d 1084 (9th Cir. 1985)............................................................................. 51

*FTC v. Figgie Int'l,*
    994 F.2d 595 (9th 1993)....................................................................................... 10

*FTC v. Fin. Educ. Servs., Inc.,*
    2022 U.S Dist. LEXIS 240887 (E.D. Mich. May 24, 2022)................................... 52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*FTC v. Grant Connect, LLC*,
    763 F.3d 1094 (9th Cir. 2014) ................................................................. 57

*FTC v. Grant Connect, LLC*,
    827 F. Supp. 2d 1199 (D. Nev. 2011) ................................................. 10, 58

*FTC v. Green Equitable Sols.*,
    2024 U.S. Dist. LEXIS 64326 (C.D. Cal. Feb. 2, 2024) ......................... 52

*FTC v. GTP Mktg., Inc.*,
    1990 WL 54788 (N.D. Tex. Mar. 15, 1990) ........................................... 53

*FTC v. H.N. Singer, Inc.*,
    668 F.2d 1107 (9th Cir. 1982) ........................................................... 51, 62

*FTC v. Hoyal & Assocs., Inc.*,
    859 F. App'x 117 (9th Cir. 2021) ........................................................... 51

*FTC v. Int'l Comput. Concepts, Inc.*,
    1994 WL 730144 (N.D. Ohio Oct. 24, 1994) ........................................ 62

*FTC v. Ivy Cap., Inc.*,
    2013 U.S. Dist. LEXIS 42369 (D. Nev. Mar. 26, 2013) ....................... 10

*FTC v. J.K. Publ'ns, Inc.*,
    99 F. Supp. 2d 1176 (C.D. Cal. 2000) ............................................... 57, 58

*FTC v. John Beck Amazing Profits, LLC*,
    865 F. Supp. 2d 1052 (C.D. Cal. 2012) ................................................. 57

*FTC v. Kitco of Nev., Inc.*,
    612 F. Supp. 1282 (D. Minn. 1985) ....................................................... 10

*FTC v. Kutzner*,
    Case No. 8:16-cv-00999-DOC-AFM (C.D. Cal. Oct. 19, 2016) ........... 67

*FTC v. Mallett*,
    818 F. Supp. 2d 142 (D.D.C. 2011) ....................................................... 56

*FTC v. Nat'l Urological Grp., Inc.*,
    645 F. Supp. 2d 1167 (N.D. Ga. 2008), *aff'd* 356 Fed. Appx. 358
    (11th Cir. 2009) ..................................................................................... 60

vii

*FTC v. Network Servs. Depot, Inc.*,
    617 F.3d 1127 (9th Cir. 2010) ................................................................. 57, 58, 59, 60

*FTC v. Noland*,
    2021 WL 4318466 (D. Ariz. Sept. 23, 2021) ............................................ 51, 61, 64

*FTC v. Noland*,
    2021 WL 4127292 (D. Ariz. Sept. 9, 2021) ............................................................ 59

*FTC v. OMICS Grp. Inc.*,
    374 F. Supp. 3d 994 (D. Nev. 2019) .................................................. 10, 11, 30, 57

*FTC v. On Point Cap. Partners LLC*,
    17 F.4th 1066 (11th Cir. 2021) ............................................................................. 51

*FTC v. Panda Ben. Servs., LLC*,
    2025 U.S. Dist. LEXIS 94845 (C.D. Cal. May 14, 2025) ....................................... 52

*FTC v. Pantron I Corp.*,
    33 F.3d 1088 (9th Cir. 1994) ............................................................................... 10

*FTC v. Publ'g Clearing House*,
    104 F.3d 1168 (9th Cir. 1997) ......................................................................... 11, 59

*FTC v. Sale Slash, LLC*,
    2015 U.S. Dist. LEXIS 160341 (C.D. Cal. Nov. 25, 2015) ................................... 21

*FTC v. Simple Health Plans, LLC*,
    379 F. Supp. 3d 1346 (S.D. Fla. 2019) ........................................................... 56, 64

*FTC v. Stefanchik*,
    559 F.3d 924 (9th Cir. 2009) ........................................................................ 9, 21, 60

*FTC v. Stefanchik*,
    2007 U.S. Dist. LEXIS 25173 (W.D. Wash. Apr. 3, 2007),
    *aff'd* 559 F.3d 924 (9th Cir. 2009) ........................................................................ 10

*FTC v. Stout*,
    1999 WL 34833240 (D.N.J. Dec. 8, 1999) ........................................................... 64

viii

*FTC v. Think Achievement Corp.*,
    144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259
    (7th Cir. 2002) ................................................................................................. 57

*FTC v. Thomsen-King & Co.*,
    109 F.2d 516 (7th Cir. 1940) ......................................................................... 56

*FTC et al. v. Treashonna Graham*,
    Case No. 3:22-cv-00655-MMH-JBT (M.D. Fla. Jun. 21, 2022) ......................... 67

*FTC v. USA Beverages, Inc.*,
    2005 U.S. Dist. LEXIS 39075 (S.D. Fla. Dec. 5, 2005) ......................................... 63

*FTC v. USA Fin., LLC*,
    415 Fed. Appx. 970 (11th Cir. 2011) .......................................................... 59

*FTC v. U.S. Oil & Gas Corp.*,
    748 F.2d 1431 (11th Cir. 1984) ...................................................................... 52

*FTC v. Vision Online, Inc.*,
    2024 U.S. Dist. LEXIS 98705 (M.D. Fla. May 3, 2024) ....................................... 52

*FTC v. Warner Commc'ns, Inc.*,
    742 F.2d 1156 (9th Cir. 1984 ................................................................ 53, 55

*FTC v. Willms*,
    2011 WL 4103542 (W.D. Wash. Sept. 13, 2011) .................................................. 62

*FTC v. World Travel Vacation Brokers*,
    861 F.2d 1020 (7th Cir. 1988) ................................................................... 11, 61

*FTC v. World Wide Factors, Ltd.*,
    882 F.2d 344 (9th Cir. 1989) .................................................................... 55, 56

*Giant Foods, Inc. v. FTC*,
    322 F.2d 977 (D.C. Cir. 1963), *cert. denied*, 376 U.S. 967 (1964) ...................... 30

*Goldwater Bank, N.A. v. Elizarov*,
    2023 U.S. App. LEXIS 1877 (9th Cir. Jan. 25, 2023) ......................................... 55

*Granny Goose Foods, Inc. v. Teamsters*,
    415 U.S. 423 (1974) .................................................................................. 69

1

*Gucci Am., Inc. v. Weixing Li,*
2          768 F.3d 122 (2d Cir. 2014) .................................................................. 62

3
*Heideman v. S. Salt Lake City,*
4          348 F.3d 1182 (10th Cir. 2003) ............................................................. 54

5
*Int'l Controls Corp. v. Vesco,*
6          490 F.2d 1334 (2d Cir. 1974) ............................................................... 62

7
*Johnson v. Couturier,*
8          572 F.3d 1067 (9th Cir. 2009) ......................................................... 61, 62

9
*Kemp v. Peterson,*
10         940 F.2d 110 (4th Cir. 1991) ................................................................ 54

11
*Kraft, Inc. v. FTC,*
12         970 F.2d 311 (7th Cir. 1992) ................................................................ 30

13
*Liu v. SEC,*
14         591 U.S. 71 (2020) ............................................................................... 57

15
*In the Matter of McGaughey,*
16         24 F.3d 904 (7th Cir. 1997) ................................................................... 64

17
*McGirr v. Rehme,*
18         891 F.3d 603 (6th Cir. 2018) ................................................................ 55

19
*Mullins v. City of New York,*
20         626 F.3d 47 (2d Cir. 2010) ................................................................... 54

21
*Nat'l Soc'y of Prof. Eng'rs v. United States,*
22         435 U.S. 679 (1978) ............................................................................. 56

23
*Nayab v. Capital One Bank USA,*
24         942 F.3d 480 (9th Cir. 2019) ................................................................ 47

25
*Porter v. Warner Holding,*
26         328 U.S. 395 (1946) ............................................................................. 66

27
*Removatron Int'l Corp. v. FTC,*
           884 F.2d 1489 (1st Cir. 1989) ......................................................... 11, 30
28

x

*Reno Air Racing Ass'n, Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006) .................................................................................... 69

*Resort Car Rental Sys., Inc. v. FTC*,
    518 F.2d 962 (9th Cir. 1975) ...................................................................................... 11

*SEC v. Bankers All. Corp.*,
    881 F. Supp. 673 (D.D.C. 1995) ................................................................................ 64

*SEC v. First Fin. Grp. of Tex.*,
    645 F.2d 429 (5th Cir. 1981) ...................................................................................... 65

*SEC v. Keller Corp.*,
    323 F.2d 397 (7th Cir. 1963) ...................................................................................... 65

*SEC v. Manor Nursing Ctr., Inc.*,
    458 F.2d 1082 (2d Cir. 1972) ..................................................................................... 62

*SEC v. Parkersburg Wireless LLC*,
    156 F.R.D. 529 (D.D.C. 1994) ................................................................................... 64

*SEC v. Prater*,
    289 F. Supp. 2d 39 (D. Conn. 2003) ......................................................................... 57

*SEC v. R.J. Allen & Assoc., Inc.*,
    386 F. Supp. 866 (S.D. Fla. 1974) ............................................................................. 65

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ................................................................................................... 53

*United States v. City and County of San Francisco*,
    310 U.S. 16 (1940) ..................................................................................................... 54

*United States v. Diapulse Corp. of Am.*,
    457 F.2d 25 (2d Cir. 1972) .................................................................................... 54, 55

*United States v. First Nat'l City Bank*,
    379 U.S. 378 (1965) ................................................................................................... 62

*United States v. Odessa Union Warehouse Co-op*,
    833 F.2d 172, 176 (9th Cir. 1987) ............................................................................. 53

xi

1

*In re Vuitton et Fils, S.A.*,
2        606 F.2d 1 (2d. Cir. 1979) ..................................................................................... 67

3
*Williamson v. Recovery Ltd. P'ship*,
4        731 F.3d 608 (6th Cir. 2013) .............................................................................. 63

5

6                                              **STATUTES**

7    15 U.S.C. §§ 41 – 58 ................................................................................................... 2

8
9    15 U.S.C. § 45 ............................................................................................................ 1

10   15 U.S.C. § 45(a) ........................................................................................................ 2

11   15 U.S.C. § 53(b) ............................................................................................. 2, 50, 51

12   15 U.S.C. § 57a ........................................................................................................... 2

13
14   15 U.S.C. § 57b(b) ................................................................................................ 51, 52

15   15 U.S.C. § 1681 – 1681x ........................................................................................... 2

16   15 U.S.C. § 1681b(a) ................................................................................................. 45

17
18   15 U.S.C. § 1681b(a)(2) ....................................................................................... 45, 46

19   15 U.S.C. § 1681b(a)(3)(A) .................................................................................. 45, 47

20   15 U.S.C. § 1681b(a)(3)(F)(i) .............................................................................. 45, 47

21
22   15 U.S.C. § 1681b(c)(1)(B)(i) ................................................................................... 47

23   15 U.S.C. § 1681b(f)(1) .......................................................................................... 1, 44

24   15 U.S.C. § 1681c ..................................................................................................... 37

25   15 U.S.C. § 1692*l*(a) .............................................................................................. 51, 52

26
27   15 U.S.C. §§ 6101–6108 ............................................................................................. 2

28
                                                  xii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15 U.S.C. § 6821(a) ............................................................................................ 1, 2

15 U.S.C. § 6821(a)(2) ........................................................................................ 12

15 U.S.C. § 6822(a) ............................................................................................ 51

15 U.S.C. § 6827(1) ............................................................................................ 13

15 U.S.C. § 6827(2) ............................................................................................ 13

16 C.F.R. Part 310 ............................................................................................. 1, 2

16 C.F.R. § 310.2(cc) ......................................................................................... 44

16 C.F.R. § 310.3(a)(1)(viii)(C) ........................................................................ 12

16 C.F.R. § 310.3(a)(2)(x) ................................................................................. 11

16 C.F.R. § 310.4(a)(5)(i) .................................................................................. 37

16 C.F.R. § 310.4(a)(5)(ii) ................................................................................. 42

16 C.F.R. § 310.4(a)(5)(ii)(E) ........................................................................... 42

16 C.F.R. § 310.4(a)(8) ...................................................................................... 12

16 C.F.R. § 310.4(a)(9) ...................................................................................... 44

16 C.F.R. § 310.4(b)(1)(iii)(B) .......................................................................... 47

16 C.F.R. § 310.6(b)(5) ...................................................................................... 12

16 C.F.R. § 310.8(a) ........................................................................................... 48

16 C.F.R. § 310.8(b) ........................................................................................... 48

16 C.F.R. Part 461 ............................................................................................. 1, 2

16 C.F.R. § 461.1 ............................................................................................... 12

16 C.F.R. § 461.2(a) ........................................................................................... 12

16 C.F.R. § 461.3(a) ....................................................................... 12

TSR Amendments, 75 Fed. Reg. 48,458 (Aug. 10, 2010) ......................................... 35, 36

Fed. R. Civ. P. 26(d) ....................................................................... 66

Fed. R. Civ. P. 30(a)(2) ................................................................... 66

Fed. R. Civ. P. 33(a) ...................................................................... 66

Fed. R. Civ. P. 34(b) ...................................................................... 66

Fed. R. Civ. P. 65(b) ...................................................................... 67

LRCiv 65.1 ................................................................................ 67

**MISCELLANEOUS**

S. Rep. No. 130, 103rd Cong., 2d Sess. 15-16, reprinted in 1994 U.S. Code Cong.
& Admin. News 1776 ...................................................................... 68

## I.    INTRODUCTION

Plaintiff, the Federal Trade Commission ("FTC"), brings this action to end a pernicious, massive debt relief scam that has stolen over $100 million from mostly older adults, many of whom are on fixed incomes. Defendants' outbound telemarketing scam, which includes dialing consumers on the FTC's Do Not Call ("DNC") list, consists of a three-phase call. Posing first as the consumers' credit card issuer and second as various government agencies or consumer reporting agencies ("CRAs"), Defendants tell consumers that their credit cards have been compromised and need to be closed. The fake government or CRA representative then "transfers" the consumers to the third phase: Defendants who market their debt relief services by claiming that they will reduce consumers' debts substantially. Defendants use account information unlawfully obtained from consumers' credit reports to charge illegal advance fees (typically several thousands of dollars) for debt relief services that Defendants fail to provide. Defendants are recidivists, banned from operating in three states but continue their illegal conduct by cycling through different corporate names.

Defendants' actions violate Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, multiple provisions of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, the FTC's Trade Regulation Rule on Impersonation of Government and Businesses ("Impersonation Rule"), 16 C.F.R. Part 461, Section 604(f)(1) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681b(f)(1), and Section 521(a) of the Gramm-Leach-Bliley ("GLB") Act, 16 U.S.C. § 6821(a).

1

To put an immediate stop to Defendants' unlawful scheme, the FTC seeks, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Federal Rule of Civil Procedure 65, and LRCiv 65.1, an *ex parte* temporary restraining order ("TRO") with an order to show cause why a preliminary injunction should not issue. The proposed TRO would prevent continued consumer injury and is consistent with TROs court have entered in many FTC cases in this district and elsewhere.

## II.    THE PARTIES

### A.    Federal Trade Commission

The FTC is an agency of the United States government created by statute. 15 U.S.C. §§ 41 – 58. The FTC enforces the following statutes and rules:

- Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive practices in or affecting commerce;

- the TSR, 16 C.F.R. Part 310, promulgated by the FTC pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6018, which prohibits deceptive and abusive telemarketing acts or practices;

- the Impersonation Rule, 16 C.F.R. Part 461, which was promulgated by the FTC pursuant to Section 18 of the FTC Act, 15 U.S.C. § 57a, and which became effective on April 1, 2024, which prohibits impersonating or misrepresenting affiliation with governmental entities and businesses;

- the FCRA, 15 U.S.C. §§ 1681-1681x, which protects the privacy of consumer information by limiting the provision and use of consumer credit reports; and

- Section 521(a) of the GLB Act, 15 U.S.C. § 6821(a), which prohibits "making a false, fictitious, or fraudulent statement or representation" "to obtain or attempt to obtain" from consumers "consumer information of a financial institution."

2

**B.    Defendants**

Defendants include seven related companies operating as a common enterprise ("Corporate Defendants") and three individuals who manage and run the scheme ("Individual Defendants").  The Corporate Defendants are:

- ***Accelerated Debt Settlement Inc.*** ("Accelerated Debt") is a Wyoming company incorporated on December 13, 2023. (PX25 at 10 ¶ 27, Att. D at 144-47.) Accelerated Debt also does (or has done) business under the name Accelerated Debt Solutions, ADS, and ADS Resolve. (*Id*. at 11 Table 2, Att. EE at 367, Att. II at 459.) It is registered as a foreign entity in Arizona, Colorado, Florida, Massachusetts, Mississippi, Pennsylvania, and Utah. (*Id*. at 10-11 ¶ 30 & Table 2, Att. D at 151-67, Att. F at 192, Att. EE at 367, Att. II at 459.)

- ***ADS Resolve LLC*** ("ADS Resolve") is a Nevada limited liability company organized on January 6, 2025. (*Id*. at 12 ¶ 33, Att. G at 197-200.)

- ***Financial Solutions Group LLC*** ("Financial Solutions") is a Delaware limited liability company organized on May 21, 2019. (*Id*. at 6 ¶ 19, Att. A at 72-73, Att. EE at 367.)  Financial Solutions also does (or has done) business under the name Accelerated Debt Settlement. (*Id*. at 8 Table 1, Att. A at 93.)  It is registered as a foreign entity in Indiana, Massachusetts, Mississippi, New Hampshire, Pennsylvania, Utah, Vermont, and Wisconsin. (*Id*. at 7-8 ¶ 23 & Table 1, Att. A at 76-99, Att. EE at 367, Att. II at 459.)

- ***Unified Capital Services LLC*** ("Unified Capital") is a South Dakota limited liability company originally organized on October 26, 2021, under the name Alternative Industrial Services, LLC. (*Id*. at 13 ¶ 38, Att. J at 216-18.)  On November 25, 2024, amended articles of organization were filed changing the company's name to Unified Capital and its manager to Defendant Knechtel.[1] (*Id*. at 14 ¶ 40, Att. J at 224-26.)

---

[1] Unified Capital was originally formed as a shelf company. (*Id* at 13 ¶ 38.)  A shelf company is a company that is created and allowed to age without being used for a business purpose.  The buyer of the shelf company then inherits a business name with a clean record. (*Id*.)  The address associated with Alternative Industrial Services is linked to a company called Corporations Today whose website states "[w]e offer fast, friendly, dependable service when it comes to buying aged shelf corporations, aged shelf companies, and incorporation filings.  We have aged shelf LLC's, shelf companies, and aged shelf corporations in 25 states."  Corporations Today, *About Us*, https://corporationstoday.com/about/about-us/. (*Id*. at 14 ¶ 39, Att. J at 227-29.)

3

- ***Mediawerks*** is a Wyoming corporation incorporated on June 5, 2023. (*Id.* at 15 ¶ 43, Att. M at 258-64.)

- ***Resolution Specialists LLC*** ("Resolution Specialists") is a Nevada limited liability company organized on November 24, 2024. (*Id.* at 16 ¶ 48, Att. Q at 275-79.)

- ***Futura Capital, LLC*** ("Futura Capital") is a Nevada limited liability company organized on November 12, 2024. (*Id.* at 15 ¶ 46, Att. O at 269.)

    The Individual Defendants are:

- ***Jeffrey A. Lakes*** is or was an owner, officer, director, or manager of Accelerated Debt, ADS Resolve, Financial Solutions, Mediawerks, and Futura Capital. In particular, he is the owner, president, chief executive officer, and sole director of Accelerated Debt; owner, chief executive officer and member/manager of Financial Solutions; owner, chief executive manager, and sole member/manager of ADS Resolve; president and director of Mediawerks; and sole member/manager of Futura Capital. (*Id.* at 6-7 ¶¶ 21-22, 10 ¶¶ 28, 29, 12-13 ¶¶ 33-35, 15 ¶¶ 43-44, 46, 29-33 ¶ 71 & Table 6, Att. A at 76-99, Att. B at 101-11, 115, Att. C at 124-26, 127-29, 130, 131-33, 136, 138, 139, Att. D at 154, 156, 159, 161, 164, Att. E at 169-70, Att. F at 189, 195, Att. G at 197, 200-02, Att. I at 206-07, 211-13, Att. M at 258, 264, Att. N at 266, Att. O at 269, Att. P at 272-73, Att. EE at 368, Att. GG at 399, Att. HH at 427-28, Att. II at 457-58.) He is an authorized signatory on many of Defendants' bank accounts. (*Id.* at 20-21 ¶ 68 & Table 3, 22-23 ¶ 69 & Table 4, Att. B at 101-05, 108-11, Att. C at 124-26, 127-29, 130, 131-34, 135-38, 139-42, Att. E at 169-72, Att. F at 188-91, 192-95, Att. H at 204, Att. I at 206-10, 211-14, Att. N at 266-67, Att. P at 271-73.) He is a registrant and contact for Defendants' websites and pays for those services with his credit cards. (*Id.* Att. U at 291, 293, 296, 299-300.) In response to interrogatories posed by Minnesota in their investigation of the Defendants, Lakes's role with Defendants was described as "Develops general strategy of the company." (*Id.* Att. II at 457-58.)

- ***Robert Knechtel*** is or was an owner, officer, director, or manager of Accelerated Debt, Financial Solutions, ADS Resolve, Unified Capital, and Resolution Specialists. In particular, he is a director of Accelerated Debt, the chief legal officer of Accelerated Debt, Financial Solutions, ADS Resolve, and Unified Capital; and the owner and sole member/manager of Unified Capital and Resolution Specialists. (PX01 Att. A at 16; PX02 Att. A at 13; PX03 Att. A at 12; PX05 Att. A at 18; PX06 Att. A at 10; PX07 Att. B at 18; PX09 Att. A at 22; PX11 Att. A at 22; PX12 Att. C at 16; PX13 Att. A at 18, Att. E at 42; PX15 Att. A at 19; PX17 Att. A at 9, 11, 13, Att. B at 16; PX18 Att. A at 17; PX20 Att. A at 15; PX25 at 6-7 ¶ 21, 10 ¶ 29, 14 ¶ 41, 16

4

¶ 48, 34 (PX01 Att. A at 16; PX02 Att. A at 13; PX03 Att. A at 12; PX05 Att. A at 18; PX06 Att. A at 10; PX07 Att. B at 18; PX09 Att. A at 22; PX11 Att. A at 22; PX12 Att. C at 16; PX13 Att. A at 18, Att. E at 42; PX15 Att. A at 19; PX17 Att. A at 9, 11, 13, Att. B at 16; PX18 Att. A at 17; PX20 Att. A at 15; PX23 Att. C at 21, 28; PX25 at 6-7 ¶ 21, 10 ¶ 29) 71 & Table 6, Att. D at 159, Att. J at 224, Att. K at 235, 240-42, 245, 249, Att. L at 252-53, 256, Att. Q at 275-76, 279, Att. CC at 357, Att. EE at 368, Att. II at 457-58, 479, 498-99; PX26 Att. A at 13.) He is an authorized signatory on many of Defendants' bank accounts. (PX25 at 20-21 ¶ 68 & Table 3, 22-23 ¶ 69 & Table 4, Att. K at 231-33, 245, Att. L at 252-56, Att. R at 281.) He is a registrant and contact for Defendants' websites and pays for those services with his credit cards. (*Id.* at 17 ¶ 54, Att. T at 287-88, Att. U at 304-05.) Knechtel is an attorney licensed in Arizona and Michigan, although his Arizona license is currently suspended. He responded on behalf of Defendants in an investigation by Pennsylvania. (*Id.* Att. EE at 371.) In response to interrogatories posed by Minnesota, Knechtel's role with Defendants was described as "Oversees company legal strategy and legal department." (*Id.* Att. II at 457-58.)

- *Elizabeth Reaney* is or was an owner, officer, director, or manager of Accelerated Debt and Financial Solutions. In particular, she is the chief financial officer of Accelerated Debt and Financial Solutions; officer of Unified Capital; and treasurer of Mediawerks. (*Id.* at 6-7 ¶¶ 21-22, 10 ¶ 29, 14 ¶ 41, 15 ¶ 43, 33 ¶ 71 & Table 6, Att. E at 184, Att. K at 235, Att. M at 258, Att. EE at 368, Att. II at 457-58.) She is an authorized signatory on many of Defendants' bank accounts. (*Id.* at 20-21 ¶ 68 & Table 3, Att. B at 101-02, Att. E at 169, 178, 184, Att. K at 232, 234-35, Att. N at 266-67.) In response to interrogatories posed by Minnesota, her role with Defendants was described as "Operates finance department." (*Id.* Att. II at 457-58.)

Defendants operate as a common enterprise to defraud consumers with their debt relief scheme, utilizing a network of interrelated companies. Corporate records and other documents show that the various Corporate Defendants are commonly owned or managed by the Individual Defendants and share employees and addresses. (*Id.* at 23-29 ¶ 70 & Table 5, 36-37 ¶ 78, Att. II at 494-97.) Indeed, in their response to interrogatories posed by Minnesota and Pennsylvania, Defendants admit that Accelerated Debt and Financial Solutions "are under the common ownership" of Defendant Lakes. (*Id.* Att. EE at 368, Att. II at 459.) Bank records demonstrate routine commingling of funds, with

5

regular transfers between the various companies. (*Id.* at 61-62 ¶¶ 133-139  Meanwhile, Defendants' telecommunications services are in the name of Financial Solutions with Accelerated Debt, ADS Resolve, and Unified Capital listed as branches. (*Id.* at 19 ¶ 62, Att. CC at 357.)

At first, Accelerated Debt and Financial Solutions were the consumer-facing entities. (*Id.* at 65 ¶ 147.)  After Minnesota, Pennsylvania, and Connecticut began investigating them, rather than change their tactics, they changed their names.  Now ADS Resolve and Unified Capital are the consumer-facing entities. (*Id.*)  Resolution Specialists provides payroll to the scheme's U.S. based employees. (*Id.* at 61-62 ¶ 136.) Meanwhile, Mediawerks provides operational services including paying telemarketers and obtaining consumers' credit reports. (*Id.* at 61 ¶ 134.)  Futura Capital operates a pass-through account between other accounts connected to the scheme and also pays some operating expenses. (*Id.* at 62 ¶ 137.)  Defendants, however, blur corporate distinctions when interacting with consumers—for example, consumer payments are processed by various merchant accounts in the names of Financial Solutions, Accelerated Debt (which is also a d/b/a of Financial Solutions), ADS Resolve (which is also a d/b/a of Accelerated Debt), and Unified Capital. (PX04 Att. A at 11, Att. B at 13; PX07 Att. A at 5; PX14 Att. A at 13-14, Att. B at 16-17; PX23 Att. C at 31; PX25 at 9-10 ¶ 26, 12 ¶ 32, 13 ¶ 37, 14-15 ¶ 42, 22-23 ¶ 69 & Table 4, 50 ¶ 112, 61 ¶ 133.)

Much of Defendants' operations appear to be done remotely.  Bank records indicate that when they first started operating, they were located at 3922 E. University

6

Drive, Suite 6, Phoenix, Arizona, but appear to have left during the COVID pandemic.

(PX25 Att. C at 123, 127-28, 130, 131, 135.)  Phone lists provided by Defendants to

Minnesota during its investigation suggest that many of the U.S.-based employees (*e.g.*,

the Phase 3 telemarketers and the back-office staff) work remotely from various locations

throughout the United States.  (*Id.* at 43 ¶ 91 (one large group located in Phoenix, another

in Baltimore, Maryland, with the rest spread out).)  And Defendants' responses to

interrogatories posed by Minnesota and Connecticut, confirmed by bank records obtained

by CID, indicate that Phase 1 and Phase 2 of Defendants' telemarketing scheme originate

from call centers in Pakistan.  (*Id.* at 63 ¶¶ 140-142, Att. EE at 369, Att. II at 461.)  Their

other addresses, including 1603 Capitol Avenue in Cheyenne, Wyoming (PX01 Att. B at

22; PX02 Att. A at 6; PX03 Att. A at 5; PX06 Att. A at 8; PX12 Att. C at 12; PX17 Att.

A at 6; PX19 Att. A at 5; PX23 Att. C at 20, 29; PX25 at 10 ¶ 27, 19 ¶ 63, Att. A at 85,

95, 98, Att. C at 144, Att. M at 258, 264; PX26 Att. A at 11), 3495 Lakeside Drive in

Reno, Nevada (PX07 Att. B at 7; PX09 Att. A at 10; PX11 Att. A at 10; PX13 Att. A at

6; PX14 Att. C at 19, Att. D at 21; PX20 Att. A at 7; PX25 at 12 ¶ 34, Att. G at 201), 304

S. Jones Boulevard in Las Vegas (PX05 Att. A at 6, Att. B at 25; PX15 Att. A at 7), and

515 W. 41st Street in Sioux Falls, South Dakota (PX13 Att. E at 31; PX18 Att. A at 6,

Att. B at 20; PX25 Att. L at 252), are commercial mail receiving entities.  (PX14 at 6-7 ¶

29; PX18 at 2-3 ¶ 12.)  IP log activity and other records indicate that the Individual

Defendants control the operation from their personal residences.  (PX25 at 20 ¶¶ 64-67,

Att. B at 117, Att. C at 139, Att. F at 188, 192, Att. I at 206, 211, Att. J at 225, Att. K at 231-34, 241, 244, Att. P at 271-73, Att. R at 281, Att. DD at 364.)

This action is not Defendants' first tangle with law enforcement for their activities. (*Id*. at 34-38 ¶¶ 72-81.) In October 2024, the Minnesota Attorney General entered into an assurance of discontinuance with Defendants Accelerated Debt and Financial Solutions requiring them to cease doing business in Minnesota and provide refunds of more than $1 million to Minnesota consumers. (*Id.* at 38 ¶ 81, Att. II at 500-12.) In April 2025, the Pennsylvania Attorney General entered into an assurance of voluntary compliance with Defendants Accelerated Debt and Financial Solutions whereby they agreed to cease doing business in Pennsylvania and provided $500,000 in refunds to Pennsylvania consumers. (*Id.* at 35 ¶ 74, Att. GG at 386-99.) Also in April 2025, the Connecticut Department of Banking, Consumer Credit Division entered into a consent order with Defendants Accelerated Debt and Financial Solutions whereby they agreed to cease doing business in Connecticut and provide $779,910 in refunds to Connecticut consumers. (*Id.* at 36 ¶ 77, Att. HH at 420-29.)[2] Despite these state actions, Defendants continue to operate and profit from their unlawful debt relief scheme. Instead of changing tactics, as discussed above, they merely changed their names.

---

[2] They have also been named in numerous private lawsuits alleging fraudulent conduct. (PX25 at 44-45 ¶ 93-96, Att. JJ at 514-650.)

## III.   DEFENDANTS' UNLAWFUL BUSINESS PRACTICES

Since at least 2022, Defendants have operated a debt relief scam that preys on mostly older adults using primarily outbound telemarketing but also inbound telemarketing.  Defendants have marketed their scheme to consumers located throughout the United States.  (PX01 at 1 ¶ 1 (Florida); PX02 at 1 ¶ 1 (Massachusetts); PX03 at 1 ¶ 1 (Alabama); PX04 at 1 ¶ 1 (Ohio); PX05 at 1 ¶ 1 (New York); PX06 at 1 ¶ 1 (Michigan); PX07 at 1 ¶ 1 (California); PX08 at 1 ¶ 1 (South Carolina); PX10 at 1 ¶1 (Kansas); PX12 at 1 ¶ 1 (Nebraska); PX13 at 1 ¶ 1 (Virginia); PX14 at 1 ¶ 1 (Texas); PX19 at 1 ¶ 1 (Maryland); PX20 at 1 ¶ 1 (Kentucky); PX23 at 2 ¶ 7 (Rhode Island).)  Defendants' unlawful practices fall into five main categories:  (A) false impersonations and false and misleading promises regarding their debt relief services; (B) collecting prohibited advance fees; (C) using prohibited remotely created checks; (D) unlawfully obtaining consumers' credit reports; and (E) violating the TSR's DNC provisions.

### A.   Defendants Make False and Misleading Representations to Market Their Debt Relief Services

Section 5 of the FTC Act prohibits material representations or omissions that would likely mislead consumers acting reasonably under the circumstances.  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).  A claim is material if it "involves information that is important to consumers and, hence, [is] likely to affect their choice of, or conduct regarding, a product."  *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (F.T.C. 1984)).  Express claims are presumed material, so consumers, to be deemed reasonable, are not

9

required to question the veracity of such claims. *See FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994). In addition, consumer action based on express statements is presumptively reasonable. *FTC v. Ivy Cap., Inc.*, 2013 U.S. Dist. LEXIS 42369, at *23 (D. Nev. Mar. 26, 2013); *FTC v. Data Med. Cap., Inc.*, 2010 U.S. Dist. LEXIS 3344, at *76-77 (C.D. Cal. Jan. 15, 2010); *FTC v. Stefanchik*, 2007 U.S. Dist. LEXIS 25173, at *14 (W.D. Wash. Apr. 3, 2007) ("Reasonable consumers are not required to doubt the veracity of express representations . . . ."), *aff'd* 559 F.3d 924 (9th Cir. 2009).

The FTC need not prove reliance by each consumer misled by Defendants. *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993). "Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of [Section 13(b)]." *Id.* (quoting *FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1293 (D. Minn. 1985)); *see also FTC v. OMICS Grp.*, 374 F. Supp. 3d 994, 1010 (D. Nev. 2019); *FTC v. AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *38 (D. Nev. May 1, 2017).

To determine whether a representation is misleading, the Court is not confined to analyzing isolated words and phrases but must consider the overall "net impression" that Defendants' representations make upon consumers. *See Cyberspace.com*, 453 F.3d at 1200 (solicitation can be deceptive by virtue of its net impression even if it contains truthful disclosures); *FTC v. Elegant Sols.*, 2020 WL 4390381, at *8 (C.D. Cal. July 6, 2020); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1214 (D. Nev. 2011). And because the FTC Act is a consumer protection statute, any disputed representation should

10

be construed in favor of the consumer. *Resort Car Rental Sys. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975).

The FTC need not prove that Defendants' misrepresentations were made with an intent to defraud or deceive or in bad faith. *See, e.g.*, *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989); *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir. 1988); *OMICS Grp.*, 374 F. Supp. 3d at 1010; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *17.  Indeed, good faith is not a defense to liability for violating Section 5 of the FTC Act. *See, e.g.*, *Curtis Lumber Co. v. La. Pac. Corp.*, 618 F.3d 762, 779 (8th Cir. 2010) (noting consensus that "a defendant's good faith is immaterial to whether a 'deceptive act' has occurred under § 5 of the Federal Trade Commission Act because that statute does not require an intent to deceive"); *Cyberspace.com*, 453 F.3d at 1202; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *17.  Neither is intent to deceive necessary to demonstrate a violation of Section 5 of the FTC Act. *See, e.g.*, *FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997); *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *18.

Similarly, Section 310.3(a)(2)(x) of the TSR prohibits sellers and telemarketers from making material misrepresentations about debt relief services.  16 C.F.R. § 310.3(a)(2)(x).[3]  Further, Section 310.3(a)(1)(viii)(C) of the TSR requires sellers and

[3] Defendants' telemarketing activities—both inbound and outbound calls—are covered by the TSR. Although Section 310.6(b)(5) of the TSR generally exempts from TSR coverage inbound telemarketing calls in response to general medium advertising, there is an exception to the exemption for inbound calls relating to both debt relief services and

11

telemarketers to disclose clearly and conspicuously that debt relief services will likely adversely affect consumers' creditworthiness.  16 C.F.R. § 310.3(a)(1)(viii)(C).  And Section 310.4(a)(8) of the TSR requires sellers and telemarketers to transmit or cause to be transmitted the telephone number, and where applicable, the name of the telemarketer to any caller identification service used by the recipient of a telemarketing call.  16 C.F.R. § 310.4(a)(8).

Meanwhile, Section 461.2(a) of the Impersonation Rule prohibits "materially and falsely pos[ing] as, directly or by implication, a government entity or officer thereof."  16 C.F.R. § 461.2(a).  And Section 461.3(a) of the Impersonation Rule prohibits "materially and falsely pos[ing] as, directly or by implication, a business or officer thereof."  16 C.F.R. § 461.3(b).  The Rule defines "materially" to mean "likely to affect a person's choice of, or conduct regarding, goods or services."  16 C.F.R. § 461.1.

Further, Section 521(a)(2) of the GLB Act bars the use of false or fraudulent statements to acquire a consumer's banking information.  Specifically, the act prohibits "any person" from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."  15 U.S.C. § 6821(a)(2).  "[C]ustomer information of a financial institution" refers to "information maintained by or for a financial institution which is derived from the relationship

calls initiated by a consumer in response to a direct mail solicitation. 16 C.F.R. § 310.6(b)(5).

12

between the financial institution" and its customer that is "identified with the customer."
15 U.S.C. § 6827(2). A "customer" of a financial institution is "any person" or their
authorized representative "to whom the financial institution provides a product or
service." 15 U.S.C. § 6827(1).

Here, Defendants market their purported services primarily through outbound
telemarketing using a three-phase call: first, posing as consumers' credit card issuer or
bank; second, posing as a government agency or consumer reporting agency; and finally,
conducting the sales pitch for debt relief services. Typically, all three conversations
occur during the same telephone call, although in some instances they occur in separate
calls. Defendants also use inbound telemarketing using direct mail solicitations, radio
ads, and Internet websites to solicit consumers to call, in which they receive the third-
phase sales pitch. Through their telemarketing activities, Defendants make four core
misrepresentations to market their debt relief services. In particular, during Phase 1 and
Phase 2 of their calls, Defendants falsely impersonate government and businesses,
including the SSA and the CFPB, consumers' credit card companies, and CRAs such as
Experian. During Phase 3, Defendants falsely claim that they will substantially reduce
consumers' unsecured debts; falsely claim that any negative effect on consumers' credit
scores will be temporary; and falsely claim that their fees will be included in the debts
being settled and, thus, consumers will not actually have to pay them.

13

1. **Phase 1 and Phase 2:  Defendants Falsely Impersonate Businesses and the Government**

*Phase 1: Defendants Falsely Pose as Consumers' Credit Card Issuers*

Defendants typically initiate contact with consumers through an outbound telemarketing call.  (PX01 at 1 ¶ 2; PX02 at 1 ¶ 2; PX03 at 1 ¶ 2; PX04 at 1 ¶ 2; PX05 at 1 ¶ 2; PX06 at 1 ¶ 2; PX07 at 1 ¶ 2; PX09 at 1 ¶ 2; PX10 at 1 ¶ 2; PX11 at 1 ¶ 2; PX12 at 1 ¶ 3; PX13 at 1 ¶ 2; PX14 at 1 ¶ 3; PX15 at 1 ¶ 2; PX16 at 1 ¶ 3; PX17 at 1 ¶ 2; PX18 at 1 ¶ 2; PX20 at 1 ¶ 2; PX21 at 2 ¶ 7; PX23 at 2 ¶ 8, 5 ¶ 29; PX26 at 1 ¶ 3.)  Consumers report that their caller IDs indicate the call is coming from their bank or credit card issuer and not the name of Defendants.  (PX01 at 1 ¶ 2; PX02 at 1 ¶ 2; PX03 at 1 ¶ 2; PX06 at 1 ¶ 2; PX07 at 1 ¶ 2; PX11 at 1 ¶ 2; PX13 at 1 ¶ 2; PX14 at 1 ¶ 3; PX15 at 1 ¶¶ 2, 3; PX18 at 1 ¶ 2; PX20 at 1 ¶ 2; PX21 at 3 ¶ 10.)

Once on the phone with consumers, Defendants' representatives say they are calling from the consumers' bank or credit card issuer and falsely inform consumers that fraudulent activity has been observed on one of the consumers' credit cards or that someone was trying to use the consumer's identity to open new accounts.  (PX01 at 1 ¶ 2 (Florida consumer told the caller was from Bank of America and that someone in North Carolina was trying to open a credit card account in her name); PX02 at 1 ¶ 3 (Massachusetts consumer told that someone from Texas was using her Social Security number to open a bank account using her information); PX03 at 1 ¶ 2 (consumer told that someone had access to her Social Security number and was trying to open a new account at her bank and that "there was a possibility that all my accounts had been jeopardized");

PX05 at 1 ¶ 2 (told someone was trying to open credit card in his name); PX06 at 1 ¶ 3 (Michigan consumer said that "Chase Bank" called her reporting that someone in Pennsylvania was using her credit card to make purchases); PX07 at 1 ¶ 2; PX09 at 1 ¶¶ 2-4 (told that someone was trying to apply for loan in consumer's name but fake bank agent "was worried my accounts were compromised" and that "my credit cards had been red-flagged"); PX10 at 1 ¶ 2 (claiming to be with credit card company's "fraud department," Defendants stated "they had flagged all of our credit cards for fraudulent activity"); PX11 at 1 ¶ 2; PX13 at 1 ¶ 4 (fake bank agent said "I had been hacked" and that "my other credit cards were now hacked"); PX14 at 1 ¶ 4; PX15 at 1 ¶ 2, 4 (consumer was told "someone from South Carolina had tried to increase my credit card limit" and that "my Social Security number had been redlined by the credit bureaus and that my credit cards would be cancelled"); PX18 at 1 ¶ 3 (fake bank employee "told me that someone had stolen my identity and was attempting to open an account using my information"); PX20 at 1 ¶ 3; PX21 at 2-3 ¶ 8; PX26 1 ¶ 3.)

The conversation typically ends with Defendants telling consumers that they will be transferred to a government agency or, more recently, a CRA.  (PX01 at 1 ¶ 2 (Defendants' telemarketer said she would transfer consumer to the CFPB); PX03 at 1 ¶ 3 (allegedly transferred to Equifax); PX05 at 1 ¶ 3; PX06 at 1 ¶ 4; PX09 at 1 ¶¶ 4-5; PX10 at 1 ¶ 3; PX11 at 1 ¶ 2; PX18 at 2 ¶ 3; PX20 at 1 ¶ 3; PX21 at 3 ¶ 10; PX23 at 5-6 ¶ 30; PX26 at 1 ¶ 3.)

15

***Phase 2: Defendants Falsely Pose as a Government Agency or CRA***

Defendants then transfer consumers to another representative who claims to be

with the government, typically the Consumer Financial Protection Bureau ("CFPB") or,

in some instances, the Social Security Administration ("SSA").  (PX01 at 1 ¶ 3; PX02 at

1-2 ¶¶ 3-5; PX04 at 1 ¶ 2; PX06 at 1 ¶ 4; PX09 at 1 ¶ 6; PX12 at 1 ¶ 4; PX16 at 1 ¶ 3;

PX17 at 1 ¶ 3; PX20 at 1 ¶ 4; PX23 at 5-6 ¶ 30; PX26 at 1 ¶ 4.)  More recently,

Defendants claim to transfer consumers to a representative from a CRA, typically

Experian.  (PX03 at 1 ¶ 3; PX05 at 1 ¶ 3; PX11 at 1 ¶ 3; PX18 at 1 ¶ 4; PX21 at 3 ¶ 10.)

This second representative reiterates the false claim that fraudulent activity has occurred

on one or more of the consumers' credit cards.  (PX01 at 1-2 ¶¶ 3-4 (consumer told her

cards "were red-flagged because they were in the public domain"); PX02 at 1 ¶ 3

(consumer told that all of her accounts were "unsafe"); PX03 at 1 ¶ 3 (fake Experian

representative told consumer that her cards were "red-flagged" and that "my credit card

information was on the dark web, and that my credit cards were being accessed in Dubai

and various states and countries around the world"); PX04 at 1 ¶ 2 (fake CFPB employee

claimed that "someone in Chicago had tried to use two of my credit cards to get a loan"

and that "several of my other cards had also been red flagged"); PX06 at 1 ¶ 4 (purported

SSA representative told consumer that her "identity had been stolen and that [the SSA]

would put a lock on Social Security number"); PX07 at 1 ¶ 3 (fake CFPB employee

stated "my credit report was out on the Internet as a public document and that this was

how someone got my information to use my credit"); PX08 at 1 ¶ 2 (fake CRA employee

said "my credit cards had been flagged for fraudulent activity"); PX09 at 1 ¶ 6 (fake

CFPB employee stated "all of my credit cards had been flagged" and "they would soon

be closed"); PX10 at 1 ¶ 3; PX11 at 1 ¶ 4 (fake Experian employee "told me that four of

my credit cards had been closed due to fraud" and "things like this happen when there is

a data breach"); PX13 at 1 ¶ 5 (consumer told "my credit cards and I had been red-

flagged"); PX16 at 1 ¶ 4; PX17 at 1 ¶ 3, 2 ¶ 5; PX18 at 1 ¶ 4 ("He told me that my

accounts had been red flagged and that there were people using my credit card

information"); PX20 at 1 ¶ 4 ("Mr. Stiffler told me that my Social Security number had

been stolen and all of my information had been compromised"); PX23 at 2 ¶ 8; PX26 at 1

¶ 4 ("The man told me something to the effect that all my information was 'out there,'

and that people could use it to open accounts in my name").)

As discussed in more detail in Section III.D below, Defendants appear to have

obtained consumers' credit reports before making the call. Thus, in speaking with

consumers, the representatives proceed to list some or all of the consumers' credit cards,

including full account numbers and account balances. (PX01 at 1 ¶ 3 ("He went on to list

all my information such as Social Security Number, address, credit score, my credit card

accounts and their balances"); PX02 at 1 ¶ 3; PX03 at 1 ¶ 2; PX05 at 1 ¶ 3 (representative

knew consumer's "full Social Security number, all of my credit card account numbers,

and how much I owed on each card," which "made me believe that the man did in fact

work for Experian"); PX06 at 1 ¶ 5 ("She knew my FICO score and Social Security

number"); PX07 at 1 ¶ 4; PX09 at 2 ¶ 7 (fake CFPB employee "went through each of my

17

cards with me, reciting my credit card numbers as we went, as well as my Social Security Number. He knew the balances and debt amounts on each card"); PX10 at 1 ¶ 2 ("the caller had each of my credit card numbers, and knew the balances and interest rates on each"), ¶ 4; PX11 at 1 ¶ 4; PX15 at 2 ¶ 5 ("He then read me my credit report, credit card numbers and limits, and information on my payments"); PX17 at 1 ¶ 3; PX18 at 1 ¶ 4 (he "knew all of my information, including my Social Security number and all of my credit card numbers"); PX20 at 1 ¶ 5; PX21 at 2-3 ¶ 8; PX23 at 2-3 ¶ 9; PX26 at 2 ¶¶ 7-8.) Consumers, most of whom are older adults, report feeling scared that their information was supposedly public and were convinced that the caller was who they claimed to be, because they had access to the consumer's personal financial information. (PX01 at 2 ¶ 7; PX04 at 1 ¶ 4; PX05 at 1 ¶ 3; PX06 at 1 ¶ 5 ("I was really shocked that she knew my information"); PX26 at 2 ¶ 7.)

In numerous instances, Defendants' representatives instruct consumers that they need to close their credit card accounts (or tell consumers their accounts had already been closed) and tell consumers they need to pay off the balances. (PX01 at 1-2 ¶ 4; PX02 at 1-2 ¶¶ 4; PX07 at 1 ¶ 4.) Defendants' representatives then recommend that consumers pursue debt settlement to lower their balances and say they will connect the consumer with someone who can help. (PX01 at 2 ¶ 5; PX02 at 2 ¶ 5; PX04 at 1-2 ¶¶ 3-5; PX07 at 1 ¶ 4; PX08 at 1 ¶ 4; PX09 at 2 ¶ 8; PX10 at 1 ¶ 4; PX17 at 2 ¶¶ 6-7.) Furthermore, the representatives often falsely tell consumers that because of their age they qualify for a special government program that will help them close their accounts and pay off the

18

balance with no interest rate. (PX01 at 1-2 ¶¶ 3-4 (consumer told "because I was over

sixty years old, I could receive debt reduction at a zero percent rate"); PX04 at 1 ¶ 3;

PX05 at 1 ¶ 4 (consumer told "because I was a senior citizen, the law required them to

charge me a lower interest rate"); PX06 at 1-2 ¶ 6; PX15 at 2 ¶ 6 ("He said the good news

was that because I am a senior citizen, the Fair Credit Reporting Act can help me enroll

in debt relief"); PX17 at 2 ¶ 6; PX20 at 1-2 ¶ 6; PX23 at 3 ¶ 10; *see also* PX08 at 1 ¶ 3

(consumer was told he qualified for "a program introduced during the COVID-19

pandemic that had reduced credit card interest rates for veterans"); PX10 at 1 ¶ 3

(consumer was told that he was eligible for "President Trump's Credit Reduction Act"

that "would reduce my credit card debt").)

        At this point, the representatives inform consumers that they will be transferred to

a company that can assist them with reducing their credit card debt. (PX01 at 2 ¶ 5;

PX02 at 2 ¶¶ 4-5 (consumer was told "due to my age, he [the representative] would refer

me to a US debt validator . . . who would help me close the accounts and reach a debt

settlement with no interest rate"); PX03 at 1 ¶ 4; PX04 at 1-2 ¶¶ 4-5 ("The representative

told me that this company would set me up with a payment plan, and that after a year, I

would have a 0% interest rate, make no payments for a year, and that my overall debt

would be reduced by at least 40% and up to 75%"); PX05 at 1 ¶ 5; PX07 at 1-2 ¶ 5; PX09

at 2 ¶ 12; PX10 at 1 ¶ 4; PX11 at 2 ¶ 7; PX14 at 1 ¶ 5; PX15 at 2 ¶ 6; PX16 at 1 ¶ 5;

PX18 at 1 ¶ 5; PX20 at 2 ¶¶ 7-9; PX23 at 2-3 ¶ 9; PX26 at 2 ¶ 10.)

1    Needless to say, Defendants are not a government agency, a CRA, or a bank or

2    credit card issuer.  When consumers later contact their banks or CRA, they are told there

3    had been no fraudulent activity on their accounts and that no one from their organization

4

5    had called the consumer.  (PX01 at 3 ¶ 12 (when consumer later called the CFPB, she

6    was told that the CFPB would not have her credit report or personal information); PX02

7    at 3 ¶ 10 (consumer went to her local bank branch with her call logs (containing the

8

9    numbers purportedly made from the bank), and the bank ran a search on their phone logs

10   and found no record of any calls made to the consumer's number and also informed her

11   there was no fraudulent activity alert on any of her accounts); PX06 at 3 ¶ 13 (consumer

12   later called her bank asking whether her account "had actually been compromised" and

13

14   was told "there was nothing wrong with my account"); PX11 at 5 ¶ 21 (consumer called

15   Experian and explained what happened, to which the real Experian representative "told

16   me that this absolutely sounded like a scam"); PX14 at 4-5 ¶ 20 (bank confirmed that "no

17   one had tried to open an account using my Social Security number"); PX18 at 3 ¶ 13

18

19   (consumer called bank and credit bureaus who told her "they had never called me" and

20   "No one was ever trying to steal my identity"); PX25 at 48 ¶ 104 (phone number that

21   appeared as coming from Discover in a consumer's Caller ID belonged to Defendants);

22

23   PX26 at 6 ¶ 26.)

24       Thus, Defendants have violated Section 5 of the FTC Act as alleged in Count II of

25   the Complaint; Section 301.3(a)(2)(x) of the TSR as alleged in Counts III.d, III.e, and

26

27   III.f of the Complaint; Section 310.4(a)(8) of the TSR as alleged in Count VI of the

28

Complaint; Section 461.2(a) of the Impersonation Rule as alleged in Count X of the

Complaint; Section 461.3(a) of the Impersonation Rule as alleged in Count XI of the

Complaint; and Section 521 of the GLB Act as alleged in Counts XIII.d, XIII.e, and

XIII.f of the Complaint.[4]

### 2.    Phase 3—The Deceptive Enrollment Pitch:  Defendants Make False Promises about Their Debt Relief Services

For the third phase of Defendants' outbound telemarketing scheme, the

representatives falsely posing as the government or a CRA transfer consumers to other

representatives employed by Defendants.[5]  Typically, this is the first time that consumers

---

[4] Defendants are liable for their telemarketers' misrepresentations.  With respect to Section 5 of the FTC Act and the Impersonation Rule (promulgated pursuant to the FTC Act), courts are clear that under the FTC Act, "a principal is liable for the misrepresentations of his agent acting within the scope of the agent's actual or apparent authority." *Stefanchik*, 559 F.3d at 930; *FTC v. Sale Slash, LLC*, 2015 U.S. Dist. LEXIS 160341, *8 (C.D. Cal. Nov. 25, 2015) ("a defendant cannot escape liability under the FTC Act simply by outsourcing the spam and misleading statements").  Meanwhile, the TSR's provisions are directed at both the telemarketer and the seller.  In addition, because Section 521 of the GLB Act also includes "attempt[ing] to obtain" and "caus[ing] to be disclosed," Defendants are liable.

[5] Defendants also market their debt relief services through inbound telemarketing.  To induce consumers into calling them, Defendants have used direct mail advertisements, radio and television advertisements, and a number of Internet websites.  (PX19 at 1 ¶ 2; PX25 Att. II at 462.)  For example, in direct mail advertisements, Defendants have sent postcards stating, "[First name], we want to let you know about our Accelerated Debt Solutions program, designed to help you take control of your financial situation and reduce your debt by up to 65%."  (*Id.* Att. II at 493.)  Similarly, radio ads, which appear to be run on Internet radio services such as Sirius XM, claim "Accelerated Debt Settlement can cut your debt by up to 85% and in as little as 7 to 12 months" and "In just months, Accelerated Debt Settlement's legal team will negotiate your unsecured debt down 60, 80, even 100 percent."  (*Id.* Att. FF at 376:8-10, 376:19-24, 382:7-9, 382:12-15.)  Television advertisements feature "testimonies from people talking about how great the program was.  The people in the commercial were so grateful to be out of debt."  (PX19 at 1 ¶ 2.)  Meanwhile, Defendants operate several Internet websites, including but not

hear one of the various trade names used by the Defendants, such as Accelerated Debt Solutions, ADS Resolve, Financial Solutions Group, or Unified Capital.  (PX01 at 2 ¶ 5; PX02 at 2 ¶ 6; PX03 at 1 ¶ 4; PX04 at 2 ¶ 9; PX05 at 1 ¶ 5; PX06 at 2 ¶ 9; PX07 at 1-2 ¶ 5; PX08 at 2 ¶ 6; PX09 at 2 ¶ 12; PX10 at 2 ¶ 5; PX12 at 1 ¶ 5; PX13 at 1-2 ¶ 6; PX14 at 2 ¶¶ 7-8; PX15 at 2 ¶ 7; PX16 at 1 ¶ 5; PX17 at 2 ¶ 8; PX18 at 2 ¶ 6; PX20 at 2 ¶ 9; PX21 at 3 ¶ 11; PX23 at 3 ¶ 11, 6 ¶ 31; PX26 at 2 ¶ 10.)

　　　　Defendants' representatives inform consumers (those transferred from the Phase 2 telemarketers and those responding to the inbound advertisements) that they are going to assist consumers in paying off their credit card balances, explaining that they will negotiate consumers' credit balances down to a substantially lower amount at which point the consumer would pay them off.  (PX01 at 2 ¶ 6; PX03 at 1-2 ¶ 5; PX04 at 2-3 ¶ 11; PX05 at 1-2 ¶ 6; PX07 at 2 ¶ 6; PX08 at 2 ¶ 6; PX09 at 3 ¶ 13; PX10 at 2 ¶ 5; PX12 at 1 ¶ 5; PX13 at 1-2 ¶ 6; PX14 at 2 ¶¶ 7-8; PX15 at 2 ¶ 7; PX16 at 1 ¶ 5; PX18 at 2 ¶ 7; PX19 at 1 ¶ 4; PX20 at 2 ¶7; PX23 at 6 ¶ 34.)  Defendants typically promise to reduce

---

limited to accelerateddebtsettlement.com, accelerateddebtsolutions.com, adsresolve.com, resolutionspecialistsllc.com, and unifieddebt.com.  (*Id.* at 17 ¶¶ 53-54, 17-19 ¶¶ 56, 58, 60-61, Att. S at 283-85, Att. T at 287-88, Att. V at 310-17, Att. X at 328-30, Att. Y at 332-39, Att. Z at 341-44, Att. AA at 346-48, Att. BB at 350-54, Att. II at 462.)  These websites include the claims "Complete Consolidation Reached At 0% Interest, No Penalties" and "the Legal Department has consistently achieved remarkable results, saving clients across various creditors and situations an average of over 65% off the original balance." (*Id.* Att. Y at 337, Att. BB at 351, 353.)  Embedded videos depict interviews of purported customers telling their success stories, such as "ADS helped me completely eliminate my debt," "They negotiated my debt down almost 70 percent," and "Most of my debt was gone, just like that.  They were able to reduce my debt by 70 percent."  (*Id.* at 17-18 ¶ 56, Att. V at 313, Att. W at 322:11-12, 323:23-24, 324:2-3.)  Consumers responding to these advertisements receive the Phase 3 enrollment sales pitch.

consumers' credit card debts significantly.  (PX03 at 1-2 ¶ 5 (Defendants stated "in 9 to 12 months, ADS would reduce my debts by 50 to 60 percent" and the representative "guaranteed ADS would achieve these results"); PX04 at 2-3 ¶ 11 ("He informed me that he would have all of my debt rolled into one single payment within a year and have 50% of my debt resolved in that time as well" and that "in some cases, they have been able to get their customers' debt resolved up to 75% in 12 months"), 4 ¶ 17 ("the total debt I owed would likely be reduced by 50%"); PX05 at 1-2 ¶ 6 ("He told me that when he was done, my total credit card debt would go down by 50 to 60 percent"); PX07 at 2 ¶ 6 (Defendants claimed they could "cut 50% of my debt"); PX08 at 2 ¶ 6 ("He told me they could lower the interest rates of my credit debt by 30-40%); PX09 at 3 ¶ 14 (50% reduction); PX10 at 2 ¶ 5 (Defendants said they would "get my debt balance reduced by 30-60%"); PX12 at 1 ¶ 5 ("She said they would negotiate with the credit cards to get my balances down 50%"); PX13 at 1-2 ¶ 6 ("they could cut my debt in half"); PX15 at 2 ¶ 7 ("Mr. Murray said that ADS Resolve could settle my debt by fifty percent"); PX18 at 2 ¶ 7 ("Mr. Smith explained that Unified Capital Services could lower my debt by forty-five percent"); PX19 at 1 ¶ 4 ("they told me that they would get it down to half once a settlement was made"); PX20 at 2 ¶ 7 "("This would get my balances down by fifty to seventy percent"); PX21 at 3 ¶ 11, 4 ¶ 14 (fifty percent reduction in debt); PX23 at 6 ¶ 34 (consumer was told they could reduce her total debt of about $30,000 down to between $12,000 and $18,000); PX25 Att. II at 492 (script stating "We are running a national campaign to help Americans reduce their unsecured debt by up to 75%, while helping

23

you take steps toward financial freedom"); PX26 at 2 ¶ 11 (consumer was told they could

reduce his debts from $40,000 to around $16,000).)[6]

As with the earlier representatives claiming to be with banks, the government, or

Experian, these representatives also reference consumers' private financial information.

(PX01 at 2 ¶ 6; PX03 at 1 ¶ 4 (consumer stated that Defendants "had every bit of my

personal credit information.  My mortgage, all my credit cards and credit card numbers,

every balance down to the penny, and my Social Security number"); PX04 at 3 ¶ 13

(Defendants "had accurate information about the amount of debt I owed on each of my

credit cards, as well as all of my credit card numbers"); PX08 at 2 ¶ 6; PX11 at 2-3 ¶ 9

(consumer noted that callers "had my Social Security Number, date of birth, address, and

at least four of my credit card numbers"); PX14 at 2 ¶ 7 ("Mr. Burress told me the names

and account numbers of all my credit cards.  He also told me my maiden name.  Because

he knew so much about me, I thought that he must be associated with one of my banks.

He really fooled me."); PX15 at 2 ¶ 7 ("Mr. Murray also knew my credit card numbers

and limits, and information on my payments"); PX23 at 3 ¶ 11; PX26 at 3 ¶ 13 ("I

believed her not only because she knew the names and numbers of all my credit card

accounts").)

Defendants also typically assert that they will achieve the promised debt reduction

within a specific period of time, ranging from five to twelve months. (PX01 at 2 ¶ 6 (8

---

[6] In some instances, Defendants bolster these savings claims with statements that they
have helped thousands of clients. As one consumer recalled, Defendants claimed, "ADS
had an amazing success rate and that this would be a blessing for me."  (PX03 at 2 ¶ 6.)

24

months); PX03 at 1-2 ¶ 5 (9-12 months); PX04 at 2-3 ¶ 11, 4 ¶ 17 (12 months); PX06 at 2

¶ 10 (a year); PX07 at 2 ¶ 6 (6-12 months); PX08 at 2 ¶ 7; PX09 at 3 ¶ 14 (5 months);

PX10 at 2 ¶ 5 (12 months); PX13 at 1-2 ¶ 6 (12-14 months); PX18 at 2 ¶ 7 (7 months to a

year); PX19 at 1 ¶ 4 (a year); PX21 at 3 ¶ 11.)[7]  They also instruct consumers to stop

making credit payments and ignore any communications from their credit card

companies.  (PX03 at 1-2 ¶ 5; PX04 at 2-3 ¶ 11; PX05 at 2 ¶ 9; PX07 at 2 ¶ 7; PX08 at 2

¶ 7; PX09 at 4 ¶ 21; PX10 at 2 ¶ 7; PX13 at 1-2 ¶ 6; PX14 at 2 ¶ 8; PX15 at 2-3 ¶ 8;

PX17 at 2 ¶ 8; PX18 at 2 ¶ 7; PX19 at 1-2 ¶ 6; PX20 at 2 ¶¶ 7, 9; PX21 at 4 ¶ 13; PX23 at

4 ¶ 16, 7 ¶ 38; PX26 at 2 ¶ 11.)  Defendants inform consumers that their credit scores

might go down but that they would "bounce back" after several months.  (PX01 at 2 ¶ 6

("Matt also told me that my credit score might take a hit as a result, but it would bounce

back in about eight months"); PX03 at 1-2 ¶ 5 (when told to stop making payments,

consumer asked "won't that hurt my credit rating?  Eli said no, my credit would be

resolved once I paid off my debts"); PX04 at 3 ¶ 12 (when consumer "expressed concern

about the consequences of suddenly stopping credit card payments," Defendants "assured

me that this was a federally run program, so there was nothing underhanded or risky

about it"), ¶ 15 ("He informed me that my credit score would take a hit for a few months,

---

[7] Defendants' contracts state a "Resolution Time Expectancy" of "within twelve (12) to fourteen (14) months."  (PX01 Att. A at 10; PX05 Att. A at 9; PX07 Att. B at 10; PX09 Att. A at 13; PX11 Att. A at 13; PX13 Att. A at 9, Att. E at 34; PX15 Att. A at 10; PX18 Att. A at 9; PX20 Att. A at 9.)  Earlier versions state "most Clients can achieve the result of having their debts resolved within a twelve (12) month period."  (PX02 Att. A at 7; PX03 Att. A at 6; PX19 Att. A at 6; PX23 Att. C at 23.)

but that it would recover"); PX05 at 2 ¶ 9 (told that although "my credit score would go

down," after debts reduced "my credit score would bounce back"); PX06 at 2-3 ¶ 11 ("He

said it would go down only for one year, and then it would jump back up"); PX09 at 3 ¶

14 ("I asked how my credit score would be impacted, and Mr. Collins assured me that my

score would have a slight impact, but not anything long lasting"), 4 ¶ 21 ("He assured me

again that the missed payments would not affect my credit in the long term"); PX10 at 2 ¶

5 ("Jay claimed I would see a small dip in my credit score, but that it would not last

long"); PX11 at 3 ¶ 13 ("He also told me that my credit score would go down for a short

period of time, but that it would rebound quickly"); PX13 at 1-2 ¶ 6 (consumer told "my

credit score would go down temporarily"); PX16 at 2-3 ¶ 11 ("She said for a couple of

months my credit score may 'dip,' but then after that I could build it back up"); PX17 at 2

¶ 8 ("He also told me that my credit score would go down fifteen to twenty points, but

that it would go back up above the current score after the program completed its work");

PX18 at 2 ¶ 7; PX19 at 1 ¶ 4; PX20 at 2 ¶ 7; PX21 at 3 ¶ 11; PX23 at 7 ¶ 40.)[8]

---

[8] These statements about the effects on credit score are reiterated in Defendants'
enrollment contracts (discussed in more detail below). Although the contracts bury the
disclaimer that "[t]he use of Our service will likely adversely affect Your
creditworthiness (your credit score will likely go down)" (PX01 Att. A at 10; PX02 Att.
A at 7; PX03 Att. A at 6; PX05 Att. A at 9; PX07 Att. B at 10; PX09 Att. A at 13; PX11
Att. A at 13; PX13 Att. A at 9, Att. E at 34; PX15 Att. A at 10; PX18 Att. A at 9; PX19
Att. A at 6; PX20 Att. A at 9), they later temper that disclosure by stating that
Defendants' services "will likely lower my credit score temporarily." (PX01 Att. A at
13; PX02 Att. A at 10; PX03 Att. A at 9; PX05 Att. A at 13; PX07 Att. B at 14; PX09
Att. A at 17; PX11 Att. A at 17; PX13 Att. A at 13, Att. E at 39; PX15 Att. A at 14; PX18
Att. A at 13; PX19 Att. A at 9; PX20 Att. A at 12.)

1    In some instances, Defendants' representatives also assure consumers that if they

2    are sued by any creditor, Defendants would defend them.  (PX04 at 6 ¶ 29 (when

3    consumer stated she "was very worried about the credit card companies taking legal

4    action against me if I stopped making payments," Defendants assured her that they "had a

5    team of lawyers whose job was to prevent that from happening"); PX14 at 3 ¶ 12 ("He

6    said that if the credit card companies decided to sue me, I should let him know

7    immediately, as he would provide me with a lawyer"); PX16 at 2-3 ¶ 11.)

8
9    Defendants' representatives explain that in order to proceed with the debt relief

10   services, consumers need to sign a contract electronically that would be emailed to them.

11   (PX01 at 2-3 ¶ 7; PX02 at 2-3 ¶ 6; PX03 at 2 ¶ 7; PX05 at 2 ¶ 7; PX06 at 2-3 ¶ 11; PX07

12   at 2 ¶ 8; PX08 at 2 ¶ 9; PX09 at 3 ¶ 15; PX11 at 3 ¶ 13; PX13 at 2 ¶ 8; PX15 at 3 ¶ 9;

13
14   PX18 at 2 ¶ 9; PX21 at 4 ¶ 15; PX23 at 3 ¶ 14, 7 ¶ 37.)  Defendants also state that they

15   require consumers to pay an up-front fee, typically in an amount of several thousands of

16   dollars (as discussed in more detail in Section III.B below).  (PX01 at 2-3 ¶ 7; PX02 at 2-

17   3 ¶ 6; PX03 at 2 ¶ 6; PX04 at 4 ¶ 19; PX05 at 1-2 ¶ 6; PX06 at 2 ¶ 10; PX07 at 2 ¶ 7;

18
19   PX08 at 2 ¶ 8; PX09 at 4 ¶ 18; PX10 at 2 ¶ 5; PX11 at 3 ¶ 11; PX14 at 2 ¶ 10; PX15 at 2-

20   3 ¶ 8; PX16 at 2 ¶ 9; PX17 at 2-3 ¶ 11; PX18 at 2 ¶ 8; PX19 at 1-2 ¶ 6; PX20 at 2 ¶ 10;

21   PX21 at 3-4 ¶ 12; PX23 at 3 ¶ 15, 6-7 ¶ 35; PX26 at 3 ¶ 14.)  Consumers report that the

22   contract is emailed to them almost immediately thereafter, typically a link to a document

23
24   that can be signed electronically.  (PX01 at 2-3 ¶ 7, Att. A at 7; PX02 at 2-3 ¶ 6, Att. A at

25   6-15; PX03 at 2 ¶ 7; PX05 at 2 ¶ 8; PX06 at 2-3 ¶ 11; PX10 at 2 ¶ 6; PX13 at 2 ¶ 8; PX18

26
27
28

at 2 ¶ 9; PX21 at 4 ¶ 15; PX23 at 7 ¶ 37.)  The contract is variously called a Debt Resolution Agreement (an 11-page document) and Debt Negotiation Agreement (a 14-page document).  (PX01 Att. A at 8-17; PX02 Att. A at 6-14; PX03 Att. A at 5-13; PX05 Att. A at 6-19; PX07 Att. B at 7-19; PX09 Att A. at 10-23; PX11 Att. A at 10-23; PX13 Att. A at 6-19, Att. E at 31-44; PX15 Att. A at 7-20; PX18 Att. A at 6-18; PX19 Att. at 5-12; PX20 Att. A at 7-16; PX23 Att. C at 22-29.)  The contract includes an Exhibit A with a pre-filled list of which credit cards will be "enrolled" in Defendants' debt relief program.  (PX01 Att. A at 15; PX02 Att. A at 12; PX03 Att. A at 11; PX05 Att. A at 15; PX07 Att. B at 16; PX09 Att. A at 19; PX11 Att. A at 19; PX13 Att. A at 15, Att. E at 40; PX15 Att. A at 16; PX18 Att. A at 15; PX19 Att. A at 11; PX20 Att. A at 14; PX23 Att. C at 27.)  The contract also designates the amount and which card(s) will be charged for Defendants' fee.  (PX01 Att. A at 11, 15; PX02 Att. A at 8, 11; PX03 Att. A at 7, 10; PX05 Att. A at 10; PX07 Att. B at 11; PX09 Att. A at 14-15; PX11 Att. A at 14-15; PX13 Att. A at 10-11, Att. E at 35; PX15 Att. A at 11-12; PX18 Att. A at 10; PX19 Att. A at 8, 10; PX20 Att. A at 10; PX23 Att. C at 24.)

According to the contract, Defendants agree to "work with [consumers'] creditors listed in Exhibit A to resolve [their] debts with those creditors," with some versions of the contract stating that Defendants will use their "reasonable efforts to negotiate down or eliminate" consumers' debts.  (PX01 Att. A at 8; PX02 Att. A at 6; PX03 Att. A at 5; PX05 Att. A at 6; PX07 Att. B at 7; PX09 Att. A at 10; PX11 Att. at 10; PX13 Att. A at 6, Att. E at 31; PX15 Att. A at 7; PX18 Att. A at 6; PX19 Att. A at 5; PX20 Att. A at 7;

PX23 Att. C at 22.)  The contracts also state that if a consumer is sued by a creditor,

Defendants "shall assist the Client defend [sic] any lawsuit filed by a creditor listed on

Exhibit A."  (PX01 Att. A at 9; PX02 Att. A at 7; PX03 Att. A at 6; PX05 Att. A at 7;

PX07 Att. B at 8; PX09 Att. A at 11; PX11 Att. A at 11; PX13 Att. A at 7, Att. E at 32;

PX15 Att. A at 8; PX18 Att. A at 7; PX19 Att. A at 6; PX20 Att. A at 8; PX23 Att. C at

23.)  Pursuant to the "Authorization to Communicate & Negotiate" and "Letter of

Authorization to Communicate, Negotiate and Settle" forms, consumers authorize

Defendants to communicate and negotiate with their creditors, including accepting

settlement offers made by creditors.  (PX01 Att. A at 16; PX02 Att. A at 13; PX03 Att. A

at 12; PX05 Att. A at 17-19; PX07 Att. B at 17-19; PX09 Att. A at 21-22; PX11 Att. A at

21-22; PX13 Att. A at 17-19, Att. E at 41-44; PX15 Att. A at 18-20; PX18 Att. A at 7;

PX19 Att. A at 12; PX20 Att. A at 15-16; PX23 Att. C at 28-29.)

   Buried in their contracts is a purported disclaimer that "The Company is not able

to guarantee any specific reduction of debt amount from any specific creditor" (PX02 Att.

A at 6; PX03 Att. A at 5; PX19 Att. A at 5) or "The Company DOES NOT AND

CANNOT GUARANTEE any specific reduction of debt amount from any Enrolled

Creditor" (PX01 Att. A at 9; PX05 Att. A at 7; PX07 Att. B at 8; PX09 Att. A at 11;

PX11 Att. A at 11; PX13 Att. A at 7, Att. E at 32; PX15 Att. A at 8; PX18 Att. A at 7;

PX20 Att. A at 8), but then states "In most cases, Your debt will be reduced by You

working with Our debt negotiation Team to reach an agreement with your Enrolled

Creditors."  (PX01 Att. A at 10-11; PX05 Att. A at 9-10; PX07 Att. B at 10-11; PX09

Att. A at 13-14; PX11 Att. A at 13-14; PX13 Att. A at 9-10, Att. E at 34; PX15 Att. A at 10-11; PX18 Att. A at 9; PX19 Att. A at 6; PX20 Att. A at 10.)  In any event, unexpected, non-obvious disclosures that contradict false claims cannot cure them.  Any disclaimers must be prominent and unambiguous to change the apparent meaning and leave an accurate impression.  *Kraft, Inc. v. FTC*, 970 F.2d 311, 325 (7th Cir. 1992); *Removatron Int'l*, 884 F.2d at 1497; *OMICS Grp.*, 374 F. Supp. 3d at 1010.  Moreover, a "disclosure that contradicts the original assertion only creates further uncertainty."  *Giant Foods, Inc. v. FTC*, 322 F.2d 977, 986 (D.C. Cir. 1963), *cert. denied*, 376 U.S. 967 (1964).

Further, many consumers never see these disclosures.  At this point, consumers, many of whom are older adults, have been on the phone for a lengthy period of time, sometimes an hour or more and have been told repeatedly that one or more of their credit cards or identities had been compromised.  (PX01 at 2-3 ¶ 7 ("At this point I had spoken to a lot of different people, and I had been on the phone for over an hour"); PX02 at 2-3 ¶ 6 ("By this point, I had spoken to five different people and had been on the phone for more than two hours"); PX03 at 2 ¶ 9 (phone call lasted four hours); PX09 at 3 ¶ 16 ("at that point I had been on the phone for hours, I was tired, and afraid of how compromised my credit card accounts seemed to be"); PX11 at 2-3 ¶ 9 ("I had been on the phone for many hours, and I was very tired"); PX15 at 2 ¶ 6 (call lasted over four hours); PX18 at 2 ¶ 9 ("After being on the phone for four hours and being told that my identity had been stolen, I signed the contract").)  Defendants encouraged consumers to sign quickly, even

30

when providing only excerpts of the contract.[9]  (PX01 at 2-3 ¶ 7 ("Because I felt scared and I believed that my personal information was compromised, I agreed and signed the contract while I was on the phone."); PX02 at 2-3 ¶ 6 ("Because I felt pressured, I signed the agreement while on the phone"); PX07 at 2 ¶ 8 ("I didn't have a chance to review it because he was talking to me the whole time I was signing.  I felt pressured to sign it because I was so upset about what I thought was going on with my credit, because my credit was good"); PX08 at 2 ¶ 9 (when consumer tried to pull up contract to sign, "the page that came up was not a full contract, however.  It was a single page, and had only one or two sentences on it, along with a signature line," and that telemarketer said that "they would send me a full copy of my contract after I signed"); PX11 at 4 ¶¶ 14-15 (when consumer said she was flustered and not able to read contract clearly, "Mr. Taylor just told me not to worry, and to click on the box to initial it," and when she asked again what she was signing, "Mr. Taylor told me not to worry, this was all just a formality,"

_____

[9] In some instances, Defendants enroll consumers and charge their credit cards without any authorization at all.  For example, when one consumer said that she did not want any debt relief, she heard someone say, "don't worry, we'll go in the back way." (PX12 at 1 ¶ 6.)  She thought "it sounded like they were talking to someone else." (*Id.*)  She ended the call shortly thereafter without agreeing to anything. (*Id.*)  However, she discovered that Defendants had without her authorization charged $9,900 to her Discover card and $9,460 to her Citibank card. (*Id.* at 2 ¶ 7.)  Another consumer told Defendants "very firmly" that she needed to discuss with her husband before deciding anything and then hung up the phone. (PX14 at 3 ¶ 14.)  She noted "hearing noises from someone typing in the background" while on the phone. (*Id.*)  After the call, she called one of her credit card companies, and they told her that "someone had tried to place a large charge to my card, but that it didn't go through." (*Id.* at 4 ¶ 18.)  Unfortunately, when she called her other credit card company, she learned that "$9,900 had been charged." (*Id.* ¶ 19, Att. A at 13-14 (charge by ADS Resolve).)  She later learned that Defendants charged $8,210 to another of her cards. (*Id.* at 5 ¶ 23, Att. B at 16-17.)

ultimately the consumer "was so panicked and afraid of what was going on" and "just

wanted the experience to be over," that "I did what Mr. Taylor instructed"); PX13 at 2 ¶ 8

("I felt pressured to sign right away without reviewing it.  It was at this point that my

emotions were high, and my judgment was quite clouded as to what I was agreeing to");

PX17 at 2 ¶ 9 (Defendants called consumer while her mom was dying—"I repeatedly

explained to Mr. Brown and Nathan that I needed to call them back because my mom

was transitioning to death and that I was sitting with her on her deathbed" to which they

replied "I could not call back and that I would lose all of my credit if I ended the call.  I

was petrified and upset").)  Indeed, contracts submitted by Defendants to Minnesota

show many were electronically signed within minutes of being opened by consumers.[10]

(PX25 at 41 ¶ 88 & Table 8; *see also* PX02 Att. A at 15; PX03 Att. A at 14; PX05 Att. A

at 20.)

### 3.    Defendants Do Not Provide the Promised Debt Relief Services

Despite their strong promises, Defendants have generally failed to obtain any debt

relief for consumers.  After paying thousands of dollars in fees and seeing their credit

scores plummet, consumers typically discover that none of their unsecured debts have

been reduced or eliminated.[11]  (PX05 at 3 ¶ 15; PX08 at 3-6 ¶¶ 13-24; PX10 at 3-4 ¶¶ 9-

---

[10] For 35% of the consumers, they signed the contract within 5 minutes of opening
(including 9.2% within 2 minutes and 13.4% within 2-3 minutes).  Barely 25% took more
than 15 minutes between opening and signing the multi-page document.  (PX25 at 41 ¶
88 & Table 8.)

[11] Shortly after they enroll and pay thousands of dollars in up-front fees, Defendants send
consumers several "welcome" documents.  (PX01 at 3-4 ¶ 13, Att. B at 21-26; PX05 at 2-
3 ¶ 11, Att. B at 23-32; PX06 at 3 ¶ 16, Att. A at 8-16; PX08 at 3 ¶ 11, Att. A at 9; PX15

14; PX16 at 4 ¶ 21; PX21 at 5-6 ¶¶ 19-20; PX23 at 11 ¶ 58 (consumer paid $9,581 in fees only to have Defendants settle one of her four debts and that was only for a $2,984 reduction); PX26 at 8 ¶ 38.)  Further, because Defendants have advised consumers not to make payments on their credit cards, most victimized consumers find themselves worse off, having fallen further into debt and their credit rating diminished.  (PX08 at 4-6 ¶¶ 19, 24, 7 ¶ 28; PX10 at 7 ¶¶ 26, 27; PX16 at 4 ¶¶ 19, 21, 22; PX19 at 2-3 ¶¶ 11-14; PX21 at 5 ¶ 20; PX26 at 8 ¶ 37 ("I am out the $9,850 fee that they charged to my Citibank card.  I am also out an additional amount for the late fees and interest that accrued . . . And my credit score, which had been around 800 before Accelerated Debt Solutions got involved, has dropped all the way down to the 500s").)  For example, one consumer reports that Defendants never performed any work for him; that he incurred $6,000 to $10,000 in late

at 4 ¶ 15; PX17 at 3 ¶¶ 13-14, Att. A at 6-13, Att. B at 15-17; PX18 at 2 ¶ 11, Att. B at 20-21; PX23 Att. C at 20-21; PX26 at 4 ¶ 20, Att. A at 11-17.)  One such document, entitled "Procedure for Notifying Creditors," includes letters addressed to the consumer's creditors that are to be signed by the consumer that purport to authorize Defendants to communicate with and receive correspondence from those creditors.  (PX01 Att. B at 24-26; PX05 Att. B at 27-30; PX06 Att. A at 11-26; PX12 Att. C at 14-16; PX17 Att. B at 17; PX26 Att. A at 14, 16-17.)  Contrary to Defendants' telemarketers' promises of assistance and being consumers' "advocates", the "Procedure" informs consumers that they must send the letters themselves to their creditors:  "The following letter(s) must be signed and mailed by you to your Creditor(s).  We have not sent them as they need to be signed by you."  (PX01 Att. B at 24; PX05 Att. B at 27; PX06 Att. A at 11; PX12 Att. C at 14; PX17 Att. B at 17; PX26 Att. A at 16.)  This is curious as the enrollment contract already includes authorizations and letters of authorization electronically signed by the consumers that would allow Defendants to begin the debt settlement process.  (PX01 Att. A at 16; PX02 Att. A at 13; PX03 Att. A at 12; PX05 Att. A at 17-19; PX07 Att. B at 17-19; PX09 Att. A at 21-22; PX11 Att. A at 21-22; PX13 Att. A at 17-19, Att. E at 41-44; PX15 Att. A at 18-20; PX18 Att. A at 16-18; PX19 Att. A at 12; PX20 Att. A at 15-16.)  The FTC suspects that placing this requirement on consumers provides a ready excuse for Defendants to use when consumers complain that nothing has been done.

33

fees and extra interest because he stopped making payments, on Defendants' instruction (PX08 at 4 ¶ 19); and that his credit score plunged from 730 to 499. (*Id.* at 5-6 ¶ 24.) Another consumer, an Army veteran, states that he owes "$13,000 more now than I would have if Accelerated Debt Solutions had not gotten involved" (PX10 at 7 ¶ 27), and that his credit score plummeted from the high 700s to the 570s.[12] (*Id.* ¶ 26.) Another consumer, who states that Accelerated Debt Solutions "took my money and disappeared," reports that he previously had "excellent credit" but that his credit score has dropped by 200 points. (PX16 at 4 ¶¶ 19, 22.) Yet another lamented "[w]ith my previous debt and the $11,700 in fees, I now owed $37,732. That was more than I ever owed before signing up with Accelerated Debt Settlement." (PX19 at 2 ¶ 11.)[13] Indeed, most consumers report having had stellar credit scores before ever being contacted by Defendants (PX04 at 1 ¶ 3; PX06 at 2-3 ¶ 11; PX07 at 2 ¶ 8; PX08 at 5-6 ¶ 24; PX09 at 2 ¶ 7; PX11 at 1-2 ¶ 5; PX14 at 2 ¶ 9; PX23 at 7 ¶ 40; PX26 at 2 ¶ 9), and a review of consumers' credit reports produced by Defendants to Minnesota shows that most had credit scores over 700 before enrolling in Defendants' services. (PX25 at 39 ¶ 83.)

---

[12] The consumer also noted that, because several of his credit cards went into default because Defendants had told him to stop paying, he almost had his security clearance (that he needs for his job) revoked. (*Id.* at 7 ¶ 26.)

[13] In addition, when the consumer was sued by her credit card companies and called Defendants regarding the legal defense claims, "[t]hey did not call me back and did not do anything to help me." (PX19 at 3 ¶ 13.)

34

Even for those consumers for whom Defendants obtained some reductions in debts, in most cases Defendants' fees far exceed any savings.[14]  (PX10 at 4 ¶ 14 (consumer had a $7,000 debt settled for $3,700, but "the balance on that card had been zero before Accelerated Debt Solutions had contacted me.  The only charge that they had negotiated down on that card was the fee they themselves had charged for their services, along with about $2,000 in late fees and interest.  So, in the end, this negotiation cost me $3,700."), 7 ¶ 27 ("Accelerated Debt Solutions only successfully negotiated two of my cards:  $3,300 off my Citibank card (which I only had a balance on because they charged $5,000 of their fee to it) and $3,400 off my wife's Chase card.  Their services still ended in a net loss for me, as I now owe about $13,000 more now than I would have if Accelerated Debt Solutions had not gotten involved with my debts"); PX19 at 2 ¶ 12 (after being charged $11,700 in fees, "I owed $9,811.46 on the [Discover] card, and they settled it for $6,868.02 plus $615 in interest.  I only saved $2,328.44.  Yet even with that settlement, after a year of interest on all of my other credit cards, I now owed $36,023.54.  This is still more than I ever owed before signing up with Accelerated Debt Settlement"); PX23 at 11 ¶ 58 (Defendants settled one card for $2,984 savings but charged consumer $9,581 in fees); PX25 at 40 ¶ 85 (consumer, before enrolling in Defendants' services, had a balance of $681 on her credit card.  Defendants charged $8,700 in fees to that card

---

[14] *See* TSR Amendments, 75 Fed. Reg. 48,458, 48,500-01 (Aug. 10, 2010) ("savings claims must be calculated based on the amount of debt owed at the time of enrollment, rather than the amount at the time of settlement, in order to account for (a) increases in debt levels from creditor fees or interest charges that accrue during the period of the program, and (b) fees the consumer pays to the provider").

35

(ultimately raising the balance, after late fees and interest, to $11,141.86). But

Defendants only settled that balance for $7,116, leaving the consumer paying the bulk of

the $8,700 fee).)

Defendants' own records relating to a sample of 163 Minnesota consumers that

they produced to Minnesota illustrate Defendants' failure to provide the promised debt

relief. Those documents reflect that those Minnesota customers enrolled 397 debts

totaling $3,441,053.61 in Defendants' debt relief services. (*Id.* at 41-42 ¶ 89.) The

documents show that 98 consumers (or 60%) did not have any debts settled by

Defendants. (*Id.*) And of the 397 debts enrolled, Defendants were only able to obtain

some reductions for 101 debts, in other words only 25% of enrolled debts for the 163

Minnesota consumers were settled.[15] (*Id.* Table 9.) Meanwhile, the minority of those

Minnesota consumers for whom Defendants did obtain some settlement enrolled

$970,454.30 in debts. Defendants obtained settlements for those debts totaling

$554,907.79 (for an apparent savings of $415,546.51); but Defendants charged those

consumers $473,334.88 in fees—over $57,000 *more* than their savings, resulting in a net

loss of 6%. (*Id.* at 41-42 ¶ 89 & Table 9.) But because any savings calculations needs to

take into account all 163 Minnesota consumers (in the sample) from whom Defendants

---

[15] Defendants cannot limit their definition of "success" to only those consumers for whom they obtained some settlements. Courts have rejected this type of gerrymandering to inflate artificially success rates. *See FTC v. Connelly*, 2006 U.S. Dist. LEXIS 98263, at *34-36 (C.D. Cal. Dec. 20, 2006) (denominator is all consumers not just those with settlements); *see also* TSR Amendments, 75 Fed. Reg. at 48,501 ("in making savings claims, a provider must take into account the experiences of *all* of its past customers, including those who dropped out or otherwise failed to complete the program").

charged a total of $1,200,009 in fees, the net loss for the 163 Minnesota consumers was over $784,000, or more than 22%. (*Id.* at 42-43 ¶ 90 & Table 10.)

Defendants' claims that any negative effects on consumers' credit scores will only be temporary are also false. Under the FCRA, accurate, negative information (including a history of late payments or charged- or partially charged-off accounts) can remain on credit reports for seven years, and there is no legal way to remove such information. *See* 15 U.S.C. § 1681c. Thus, it typically takes years for consumers to return to the high credit scores they had before enrolling in Defendants' services.

Thus, Defendants' false representations violate Section 5 of the FTC Act as alleged in Counts I.a and I.c of the Complaint; Section 310.3(a)(2)(x) of the TSR as alleged in Counts III.a and III.c of the Complaint; and Section 521(a) of the GLB Act.[16] as alleged in Counts XIII.a and XIII.c of the Complaint. Further, by misrepresenting that any reductions in credit score are only temporary, Defendants fail to disclose the adverse effects of their services on consumers' creditworthiness in violation of Section 310.3(a)(1)(viii)(C) of the TSR as alleged in Count IV of the Complaint.

**B.    Defendants' Collection of Illegal Advance Fees**

Section 310.4(a)(5)(i) of the TSR prohibits sellers and telemarketers from collecting advance fees for debt relief services. 16 C.F.R. § 310.4(a)(5)(i). Here, as discussed above, Defendants require consumers to pay an up-front fee to enroll in the

---

[16] As discussed further in Section III.C below, in many instances, Defendants make these false statements to induce consumers to provide customer information of a financial institution, namely their bank account and routing numbers.

37

debt relief services.  (PX01 at 2 ¶ 7; PX02 at 2-3 ¶ 6; PX03 at 2 ¶ 6; PX04 at 4 ¶ 19, ¶ 20 (consumer told that fee "would be charged upfront, before any services were rendered"); PX05 at 1-2 ¶ 6; PX06 at 2 ¶ 10; PX07 at 2 ¶ 7; PX08 at 2 ¶ 8 (told "they would charge in advance"); PX09 at 4 ¶ 18; PX10 at 2 ¶ 5; PX14 at 2 ¶ 10; PX15 at 2-3 ¶ 8; PX16 at 2 ¶ 9; PX17 at 2-3 ¶ 11 (consumer was told "I would only need to pay a small fee"); PX18 at 2 ¶ 8; PX19 at 1-2 ¶ 6; PX20 at 2 ¶ 10; PX21 at 3-4 ¶ 12; PX23 at 3 ¶ 15, 7 ¶ 36; PX26 at 3 ¶ 14.) Consumers report fees ranging from about $4,000 to about $19,000, with the average being about $12,000.  (P01 at 2 ¶ 7 ("He explained that the company requires $7,150"); PX02 at 3 ¶ 9 (Defendants charged one card $5,505 and another card $2,500); PX03 at 2 ¶ 6 ("Eli told me the fee for all this would be $15,900"), ¶ 8 ("he charged $9,900 to my Citibank card and $6,000 to my American Airlines Aviator card"); PX04 at 4 ¶ 19 (fee of $13,980); PX05 at 2 ¶ 10 ($4,995 fee); PX06 at 2 ¶ 10 ("He said they would take $7,300 from my Bank of America card and $6,900 from my American Express card."); PX07 at 2 ¶ 7 ("He said ADS would charge $9,990 on my Citibank credit card and $1,352 on my Chase credit card"); PX08 at 2 ¶ 8 ($9,200 fee); PX09 at 4 ¶ 18 (fee of $19,189 split between two cards); PX10 at 2 ¶ 5 ($11,000); PX11 at 5-6 ¶ 22 (two charges of $5,600 and $9,995); PX12 at ¶ 7 ($19,360 across two cards); PX13 at 2 ¶ 9 (consumer charged $9,995 on one card and $9,600 on another, totaling $19,595); PX14 at 2 ¶ 10 ("He told me that his fee for this service was 30% or 35% of my total existing balance, which he would put on my credit cards," which for this consumer was $9,990 on one card and $8,210 on another); PX15 at 2-3 ¶ 8 ($9,930 split between two cards); PX16

38

1    at 2 ¶ 9 ("$7,000 charge"); PX17 at 3 ¶ 15 (Defendants charged her credit cards $18,880

2    in fees); PX18 at 2 ¶ 8 ("I needed to pay a fee of $13,900"); PX19 at 2 ¶ 8 ($11,700 split

3    between two cards); PX20 at 2 ¶ 10 ($6,453); PX21 at 3-4 ¶ 12 ($9,995); PX23 at 3 ¶ 15

4
5    ($4,027), ¶ 36 ($9,581); PX26 at 3 ¶ 14 ($12,050).)  Indeed, contracts submitted by

6    Defendants to Minnesota show similar significant charges, including some of almost

7    $20,000.  (PX25 at 39-40 ¶ 84 & Table 7.)

8
       Defendants, to reduce the "sticker shock" of their fees, assure consumers that their
9
10   fee will be part of the debt being settled and, thus, consumers ultimately will not be

11   responsible for paying that fee.  (PX03 at 2 ¶ 6 (Defendants explained that the fee "would

12   not be an out-of-pocket expense" but "it would be added to my debt"); PX05 at 1-2 ¶ 6
13
14   (told that fee would be "reduced when he settled my other debts"); PX06 at 2 ¶ 10

15   (consumer told that debt relief "would not cost me a penny" and that the fee "would not

16   come from me"); PX09 at 4 ¶ 18 (consumer was promised "that I would be reimbursed
17
18   once my debts were successfully negotiated"); PX10 at 2 ¶ 5 ("Jay assured me that they

19   would eventually negotiate the $11,000 down, so I would not actually pay that much in

20   the end"); PX11 at 3 ¶ 11 (consumer was told "that I would not end up needing to pay it"
21
22   and that "He said they always got the credit card companies to pay the fee instead");

23   PX13 at 1-2 ¶ 6 ("They told me that their services would not cost anything up front and

24   that they would recoup the costs in the end"); PX16 at 2 ¶ 9 ("She said that they would

25   put the charge on my credit card so that Accelerated Debt Solutions would not have to
26
27   collect an 'out-of-pocket' payment directly from me"); PX19 at 1-2 ¶ 6 (Defendants

28
                                              39

stated "the fees would be removed later"); PX20 at 2 ¶ 10 ("Mr. Lambert told me not to worry about this fee because it would be negotiated down with Bank of America").)  In numerous instances, consumers report that Defendants also assure them that the fees would "sit in escrow" and "go to an escrow account."  (PX01 at 2 ¶ 7; PX04 at 4 ¶ 20 ("Mr. Smith informed me that the money would be held in escrow, and they would not take the money themselves"); PX06 at 2 ¶ 10 ("He told me the money would sit in escrow"); PX09 at 4 ¶ 18 ("He promised this money would be held in escrow as lawyer fees"); PX10 at 2 ¶ 5; PX15 at 2-3 ¶ 8 (Defendants said "the payment would go into an escrow account, and that ADS Resolve would not be paid until they resolved all of my debt issues"); PX18 at 2 ¶ 8 ("He said this fee would go into an escrow account and be used towards paying my debt").)  And Defendants' contracts claim "[a]ll fees collected go into an escrow account" and "[t]he charges will be placed in escrow until such time as the Charge is earned by the Company."  (PX02 Att. A at 9; PX03 Att. at 8; PX05 Att. A at 10; PX07 Att. B at 11; PX09 Att. A at 14; PX11 Att. A at 14; PX13 Att. A at 10, Att. E at 35; PX15 Att. A at 11; PX18 Att. A at 10.)

As discussed above, Defendants already know consumers' credit card numbers to charge the fee.  (PX03 at 2 ¶ 8 ("He never told me he was going to charge my cards.  He just said, 'How about if we put those Citi cards on the program?'  He did not ask me for my credit card numbers because he already had them"); PX07 at 2 ¶ 7 ("He did not ask me for my credit card information").)  And because Defendants already had consumers' credit reports, they knew consumers' current balances and credit limits.  Thus, although

Defendants represented to Pennsylvania and Minnesota that their fees were based on the amount of enrolled debt, typically 30% (PX25 Att. EE at 371, Att. II at 463), documents produced to Minnesota indicate that Defendants use the fee to extract the available balances from their victims' credit cards. By comparing consumers' credit reports with their enrollment contracts, the fees charged by Defendants typically approximated the amount of those consumers' available credit.[17] (*Id*. at 39-40 ¶ 84 & Table 7.) For example, one consumer had $9,468 of available credit on one credit card and $8,819 on another card (for a total of $18,287); Defendants charged $8,500 and 8,700, respectively, (for a total of $17,200) in fees to those cards. (*Id*. at 40 ¶ 86.) Indeed, one percipient consumer noted:

> I also realized, upon looking more closely at my credit card statements, that the $13,980 service fee was not a coincidental amount. At the time of my first phone call with Mr. Smith, I had almost exactly $13,980 in available credit between the two credit cards he charged. He knew the balances of all my credit cards and had charged me the exact amount it would take to max out my main two cards within $10 of the remaining credit.

(PX04 at 8 ¶ 38; *see also* PX13 at 2 ¶ 9 (after signing the contract, consumer's credit cards "were charged the full credit limit amounts at the same time").)

And Defendants waste no time in charging consumers' credit cards their exorbitant fees. Consumers consistently report that their cards were charged either while they were still on the phone or almost immediately after the call ended. (PX01 at 3 ¶ 8;

---

[17] Credit reports and contracts produced by Defendants to Minnesota show that consumers with a total available credit of $141,292 were charged $108,807 in fees; in other words, Defendants extracted roughly 77% of consumers' available credit. (*Id*. at 39-40 ¶ 84 & Table 7.)

PX02 at 3 ¶ 9, Att. B at 17; PX03 at 2 ¶ 8; PX04 at 5 ¶¶ 21, 23, Att. A at 11, Att. B at 13;

PX05 at 2 ¶ 10; PX06 at 3 ¶ 15; PX07 at 2 ¶ 7, Att. A at 5; PX08 at 3 ¶ 10; PX09 at 4 ¶

20, Att. B at 25-26; PX10 at 3 ¶ 8; PX11 at 5 ¶ 20; PX16 at 2 ¶ 9; PX18 at 2 ¶ 10; PX19

at 2 ¶ 8; PX20 at 2-3 ¶ 11; PX21 at 4 ¶ 16; PX26 at 3 ¶ 16.)  But Defendants have not

provided any of the promised debt relief services when they charge consumers' cards.

Further, contrary to their representations that the funds would be held in escrow,

Defendants simply deposit the funds into their own corporate accounts.[18]  (PX25 at 22-23

¶ 69 & Table 4, 54¶ 128.)

Finally, Defendants' claims that consumers would not be the ones actually paying

the fees (because they would be included in the settled debts) are as illusory as their

---

[18] Defendants cannot take advantage of the safe harbor under Section 310.4(a)(5)(ii) of
the TSR that allows the collection of advance fees if those fees are escrowed (in addition
to other requirements).  First, as discussed, their claims of escrowing are false.  Equally
important, Defendants fail to meet any of the other requirements of the safe harbor; for
example, they do not allow consumers to "withdraw from the debt relief service at any
time without penalty" (even the day of signing) nor do they allow consumers to "receive
all funds in the account" When they cancel.  16 C.F.R. § 310.4(a)(5)(ii)(E).  Defendants'
contracts state that their fee is "NON-REFUNDABLE," "You are not entitled to a refund
once payment has been made," and that they "will not and do[] not refund any payment
made by you."  (PX01 Att. A at 11, 15; PX02 Att. A at 8-9, 12; PX03 Att. A at 7-8, 11;
PX05 Att. A at 10, 11, 15; PX07 Att. B at 11, 16; PX09 Att. A at 14, 19; PX11 Att. A at
14, 19; PX13 Att. A at 10, 15, Att. E at 35, 40; PX15 Att. A at 11, 16; PX18 Att. A at 10,
15; PX19 Att. A at 8, 11; PX20 Att. A at 10, 14.)  For example, one consumer called
back Defendants "later that day," but was told "I could not withdraw because I had
already signed the agreement" and "the contract I signed did not allow a period of
rescission."  (PX02 at 3 ¶ 8; *see also* PX09 at 5-6 ¶ 28 ("Natasha told me that I had no
ability to cancel my contract or get my money back"); PX13 at 2 ¶ 10 (when consumer
tried to cancel, Defendants told her "that the charges to my credit cards were
nonrefundable").)

claims of debt settlement.  First, as discussed above, numerous consumers report that Defendants fail to settle any of their enrolled debts, leaving consumers responsible for the entirety of the fee.  Second, even when Defendants do obtain some settlement it often does not include the full amount of the hefty fees.  For example, one consumer, before enrolling in Defendants' services, had a balance of $681 on a credit card.  Defendants charged $8,700 in fees to that card (ultimately raising the balance, after late fees and interest, to about $11,141.86).  But Defendants only settled that balance for $7,116, leaving the consumer paying the bulk of the $8,700 fee.  (PX25 at 40 ¶ 85.)  Another consumer had $12,497 in outstanding credit card balances settled for $9,072, for an apparent savings of $3,425, but paid $15,340 in fees.  (*Id.* at 40 ¶ 87.)  A third consumer had $19,671 in outstanding balance settled for $11,986, but the savings of $7,685 were barely half of the $14,650 in fees he paid.  (*Id.*)

Thus, Defendants violate Section 310.4(a)(5)(i) of the TSR as alleged in Count V of the Complaint.  And their false claims that consumers would not be the ones actually paying the illegal advance fee violate Section 5 of the FTC Act as alleged in Count I.b of the Complaint; Section 310.3(a)(2)(x) of the TSR as alleged in Count III.b of the Complaint; and Section 521(a) of the GLB Act as alleged in Count XIII.b of the Complaint.

**C.    Defendants Unlawfully Use Remotely Created Checks**

Section 310.4(a)(9) of the TSR prohibits sellers and telemarketers from creating or causing to be created, directly or indirectly, a remotely created payment order as payment

43

for goods or services offered or sold through telemarketing.  16 C.F.R. § 310.4(a)(9).  A

remotely created payment order includes a remotely created check.  16 C.F.R. §

310.2(cc).

Here, bank records demonstrate that, in numerous instances, Defendants have

created or caused to be created remotely created checks as payment for debt relief

services sold over the phone.  (PX25 at 53 ¶ 123.)  Although in most instances,

Defendants charge their illegal advance fee to consumers' credit cards, in some instances

Defendants are not able to do so—likely because there is insufficient available credit on

the credit cards.  In addition, in recent versions of their contracts, consumers can select to

have the fee paid via ACH withdrawal.  (PX05 Att. A at 10-11; PX07 Att. B at 11-12;

PX09 Att. A at 14-15; PX11 Att. A at 14-15; PX13 Att. A at 10-11, Att. E at 35; PX15

Att. at 11-12; PX18 Att. A at 10.)  Because bank account information is not contained on

credit reports, in those instances Defendants require consumers to provide their bank

account and routing numbers which Defendants then use to create remotely created

checks.  (*See* PX25 at 45 ¶ 97.)

Thus, Defendants violate Section 310.4(a)(9) of the TSR as alleged in Count VII

of the Complaint.

**D.      Defendants Unlawfully Obtain Consumers' Credit Reports**

Section 604(f)(1) of the FCRA, 15 U.S.C. § 1681b(f)(1), provides that "[a] person

shall not use or obtain a consumer report for any purpose unless (1) the consumer report

is obtained for a purpose for which the consumer report is authorized to be furnished

under this section [604]." Section 604(a) of the FCRA, 15 U.S.C. § 1681b(a), sets forth

an exhaustive list of "circumstances and no other" for which a consumer report can be

used. These purposes are often referred to as the "permissible purposes." Among other

reasons, permissible purposes include (1) "in accordance with the written instruction of

the consumer to whom [the consumer report] relates," 15 U.S.C. § 1681b(a)(2); (2) "to a

person which [a CRA] has reason to believe intends to use the information in connection

with a credit transaction involving the consumer on whom the information is to be

furnished and involving the extension of credit to, or review or collection of an account

of, the consumer," 15 U.S.C. § 1681b(a)(3)(A); and (3) "to a person which [a CRA] has

reason to believe otherwise has a legitimate business need for the information in

connection with a business transaction that is initiated by the consumer." 15 U.S.C. §

1681b(a)(3)(F)(i).

As discussed above, consumers uniformly report that Defendants' telemarketers

already have their Social Security numbers and all of their credit card account data,

including full sixteen-digit numbers and credit balances. (PX01 at 1 ¶ 3, 2 ¶ 6; PX02 at 1

¶ 3; PX03 at 1 ¶¶ 2, 4; PX04 at 3 ¶ 13; PX05 at 1 ¶ 3; PX06 at 1 ¶ 5; PX07 at 1 ¶ 4; PX08

at 2 ¶ 6; PX09 at 2 ¶ 7; PX10 at 1 ¶ 2, ¶ 4; PX11 at 1 ¶ 4, 2-3 ¶ 9; PX14 at 2 ¶ 7; PX15 at

2 ¶¶ 5, 7; PX17 at 1 ¶ 3; PX18 at 1 ¶ 4; PX20 at 1 ¶ 5.) And the documents that

Defendants submitted to Minnesota included copies of consumers' credit reports. (PX25

at 38 ¶ 82, 46 ¶ 98.)

The Minnesota documents indicate that Defendants are obtaining consumers' credit reports from a third-party company called Alliance Advisors Group..[19]  (*Id.* at 46 ¶ 98.)  Bank records show multiple and regular payments totaling tens of thousands of dollars from Defendants to Alliance Advisors.  (*Id.* at 63 ¶ 143.)

Defendants have no apparent permissible purpose to obtain or use these credit reports under Section 604(a) of the FCRA.  Nowhere in the enrollment contract is there any provision instructing or authorizing Defendants to pull consumers' credit reports, as would be required under Section 604(a)(2) of the FCRA, 15 U.S.C. § 1681b(a)(2).  (*See* PX01 Att. A at 8-17; PX02 Att. A at 6-14; PX03 Att. A at 5-13; PX05 Att. A at 6-19; PX07 Att. B at 7-19; PX09 Att A. at 10-23; PX11 Att. A at 10-23; PX13 Att. A at 6-19, Att. E at 31-44; PX15 Att. A at 7-20; PX18 Att. A at 6-18; PX20 Att. A at 7-16.) Further, as discussed, consumers consistently report that Defendants already have information that could only be obtained from credit reports when the telemarketers first call.  In fact, Defendants produced credit reports to Minnesota that showed they were pulled before the contract was even electronically sent to consumers let alone signed by them—typically a day or two before.  (PX25 at 38 ¶ 82.)

Neither do other possible permissible purposes apply to Defendants.  Defendants, not consumers, typically initiate the telephone transaction, and Defendants' debt relief services do not include a "firm offer of credit," as required by Sections 604(a)(3)(A) and

---

[19] Alliance Advisors Group is or was managed by a Victor Vickery who, in February 2024, pled guilty to health care fraud in the Southern District of Florida.  (PX25 at 46 ¶ 98, Att. KK at 652-82.)

604(c) of the FCRA, 15 U.S.C. §§ 1681b(a)(3)(A) and 1681b(c)(1)(B)(i). *CFPB v. Chou Team Realty LLC*, 2021 U.S. Dist. LEXIS 207126, at *8 (C.D. Cal. Apr. 27, 2021) (debt relief services are not a permissible purpose); *Blasi v. United Debt Servs. LLC*, 2014 U.S. Dist. LEXIS 206248, at *9 (S.D. Ohio Nov. 5, 2014); *see also CFPB v. Nesheiwat*, 2022 U.S. App. LEXIS 35653, at *2 (9th Cir. Dec. 27, 2022); *Nayab v. Capital One Bank USA*, 942 F.3d 480, 496-97 (9th Cir. 2019). Similarly, again because Defendants typically initiate the transaction via their outbound telemarketing campaign, they cannot avail themselves of the "legitimate business need for the information" permissible purpose under Section 604(a)(3)(F)(i) of the FCRA. 15 U.S.C. § 1681b(a)(3)(F)(i).

Thus, lacking a permissible purpose, Defendants violate Section 604(f)(1) of the FCRA as alleged in Count XII of the Complaint.

**E.    Defendants Violate the TSR's Do Not Call Provisions**

Section 310.4(b)(1)(iii)(B) of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B), prohibits sellers or telemarketers from "initiating any outbound telephone call to a person when that person's telephone number is on the "do-not-call" registry, maintained by the [FTC], of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services." Pursuant to this section, the FTC established and maintains the National Do Not Call Registry ("DNC Registry"), a list of telephone numbers that tells registered telemarketers and sellers what numbers they cannot call. Consumers wishing to be on the DNC Registry can easily register their telephone numbers (both landline and mobile numbers) at donotcall.gov. Further, Section 310.8(a) and (b) of the TSR, 16

47

C.F.R. § 310.8(a) and (b), prohibits sellers and telemarketers from initiating an outbound telephone call in a specific area code unless they have first paid the annual fee, required by Section 310.8(c) of the TSR, to access the telephone numbers within that area code that are included in the DNC Registry.

As discussed above, Defendants market their debt relief services primarily through outbound telemarketing.  In numerous instances, Defendants have made those outbound calls to consumers on the DNC Registry.  (PX05 at 3 ¶ 16; PX06 at 1 ¶ 2; PX09 at 1 ¶ 1; PX10 at 1 ¶ 1; PX13 at 1 ¶ 1; PX14 at 10 ¶ 43; PX15 at 1 ¶ 1; PX16 at 4 ¶ 23; PX18 at 1 ¶ 1; PX20 at 1 ¶ 1.)  Indeed, when an FTC data analyst compared the telephone numbers of 198 consumers who have filed complaints to the FTC's Consumer Sentinel with the DNC Registry, 175 (or 88.4%) of those consumers were on the DNC Registry.  (PX24 at 5 ¶ 15.)  And there is no record that any of the Defendants have paid the required annual fee for access to the National Do Not Call Registry.  (PX25 at 52 ¶¶ 118-120.)

Thus, Defendants violate Section 310.4(b)(1)(iii)(B) of the TSR as alleged in Count VIII of the Complaint and Section 310.8(a) and (b) of the TSR as alleged in Count IX of the Complaint.

**F.    Defendants' Unlawful Practices Have Bilked Over a Hundred Million Dollars from Consumers**

Defendants have taken in net revenues (gross revenues less chargebacks and refunds) of at least $90 million during the three-year period before the FTC commenced this action. (PX25 at 56-60 ¶ 131 & Table 12, 60 ¶ 132 & Table 13.)

48

In many instances, consumers who try to get refunds from Defendants are denied. (PX01 at 4 ¶¶ 14, 16; PX02 at 3 ¶ 8; PX04 at 7 ¶ 35 (Defendants told consumer that "they did not process refunds under any circumstances"); PX07 at 3 ¶ 11; PX09 at 5-6 ¶ 28; PX13 at 2 ¶ 10; PX15 at 4-5 ¶ 16.)  In some instances, Defendants threaten consumers who attempt to cancel or get refunds.  (PX01 at 3 ¶ 9 (when consumer said she was going to cancel her credit card to avoid the charges, the representative "got angry at me" and "told me 'don't you dare because it's already in progress'" at which point the consumer "felt scared and threatened"); PX04 at 8 ¶ 37 (when consumer wanted to cancel, the representative told her that "he would also send a letter to all of my creditors telling them they could do whatever they wanted to get money from me"); PX09 at 6 ¶ 30 (when consumer tried to cancel, Defendants "informed me that I would be liable for any legal fees ADS Resolve incurred as a result of my complaint"); PX11 at 6-7 ¶ 26 (after consumer got chargeback, she got voicemails "that sounded very threatening.  They would ask how dare I contest the charges, that I was in violation of our contract, that they would come after me for the money I had been refunded").)

Not only do Defendants refuse refunds, but they also discourage consumers from seeking chargebacks from their credit card issuers.  For example, their contracts state that "by issuing any dispute or chargeback [the consumer] will be held liable to reimburse [Defendants] for any and all expenses in defending any such claims" and "I understand that by issuing any dispute or chargeback I will be held liable to reimburse [Defendants] for any and all expenses in defending any such claims."  (PX01 Att. A at 15; PX02 Att. A

49

at 12; PX03 Att. A at 11; PX05 Att. A at 16; PX07 Att. B at 16; PX09 Att. A at 20; PX11 Att. A at 20; PX13 Att. A at 16, Att. E at 40; PX15 Att. A at 17; PX18 Att. A at 15; PX19 Att. A at 11; PX20 Att. A at 14.)  Indeed, one consumer noted that initially "I did not apply for a chargeback on my credit cards, because I am afraid my husband and I could face legal consequences."  (PX04 at 9 ¶ 42.)[20]

## IV.    A TEMPORARY RESTRAINING ORDER SHOULD ISSUE AGAINST DEFENDANTS

This Court should issue an *ex parte* TRO enjoining Defendants' illegal practices and imposing other relief.  The Court has the authority to issue the *ex parte* TRO, the FTC meets the standard for preliminary injunctive relief, and the scope of the proposed relief, described below, is necessary and appropriate.

### A.    This Court Has Authority to Grant the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek and the Court to grant temporary, preliminary, and permanent injunctions.  The second

---

[20] While many consumers have sought chargebacks from their credit card issuers for Defendants' advance fees, issuers have denied these requests in many instances, leaving consumers—including those who are elderly and on fixed incomes—out thousands of dollars.  (PX01 at 4 ¶ 16; PX02 at 3-4 ¶ 12; PX05 at 3 ¶ 13; PX07 at 3 ¶ 12 (consumer denied a chargeback request for $9,990 because she was a "participant" in the Defendants' program); PX08 at 6-7 ¶¶ 26, 28; PX09 at 8 ¶ 39; PX13 at 3 ¶ 14, 3-4 ¶ 17, Att. D at 23, Att. F at 29; PX26 at 6-7 ¶ 29.)  Other consumers have incurred harm while they wait for issuers to review their chargeback requests, which can take several months.  (PX01 at 4 ¶ 16 (consumer had to use her savings to pay off Defendants' fee); PX08 at 4 ¶ 17, 6-7 ¶ 27 (consumer is a "retired, disabled veteran, and [he] rel[ies] heavily on [his] Social Security payments to live," but his Social Security income is being garnished while his chargeback request is pending and is forced to use savings and retirement funds to repay increase debt and Defendants' fee).)

proviso of Section 13(b), pursuant to which this action is brought, states that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."[21]  15 U.S.C. § 53(b).  The Ninth Circuit has recognized that any case alleging "violations of *any provisions of law enforced by the Commission*" constitutes a proper case for which the FTC may seek injunctive relief.  *FTC v. Evans Prod. Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985) (emphasis in original).  Courts also have held that "issuance of a preliminary injunction is an ancillary remedy available to the FTC, to the extent it is needed while the FTC pursues a permanent injunction."  *FTC v. Am. Vehicle Prot. Corp.*, 2022 WL 14638465, at *9 (S.D. Fla. Oct. 25, 2022); *see also FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1080 (11th Cir. 2021); *FTC v. Noland*, 2021 WL 4318466 at *5 (D. Ariz. Sept. 23, 2021).  Meanwhile, Section 19(b) of the FTC Act, 15 U.S.C. § 57b(b), expressly authorizes courts to grant "such relief as the court finds necessary to redress injury to consumers" for violations of the TSR, the Impersonation Rule, and Section 521 of the GLB Act,[22] including "the refund of money or return of

---

[21] This action is not brought pursuant to the first proviso of Section 13(b), which addresses the circumstances under which the FTC can seek preliminary injunctive relief before or during the pendency of an administrative proceeding.  Because the FTC brings this case pursuant to the second proviso of Section 13(b), its complaint is not subject to the procedural and notice requirements in the first proviso.  *FTC v. Hoyal & Assocs., Inc.*, 859 F. App'x 117, 120 (9th Cir. 2021) ("We have long held that the FTC can obtain injunctive relief without initiating administrative proceedings." (citing *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110 (9th Cir. 1982)).

[22] Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."  Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), a violation of the FDCPA is deemed an unfair or deceptive act or practice in

property." 15 U.S.C. § 57b(b).  By enabling the courts to use their full range of equitable

powers, Congress gave the courts authority to grant preliminary relief, including a

temporary restraining order, preliminary injunction, and asset freeze.  *FTC v. Affordable*

*Media, LLC*, 179 F.3d 1228, 1232 & n.2 (9th Cir. 1999); *FTC v. U.S. Oil & Gas*, 748

F.2d 1431, 1434 (11th Cir. 1984) ("Congress did not limit the court's powers under the

final proviso of §13(b) and as a result this Court's inherent equitable powers may be

employed to issue a preliminary injunction, including a freeze of assets, during the

pendency of an action for permanent injunctive relief").[23]  The Court, therefore, can

_____

violation of the FTC Act.  Section 814(a) of the FDCPA further provides that all of the
functions and powers of the FTC under the FTC Act are available to the FTC to enforce
compliance by any person with the FDCPA, including the powers to enforce the
provisions of the FDCPA in the same manner as if the violation had been a violation of
an FTC trade regulation rule.  *Id.*

[23] This remains true despite the Supreme Court's ruling in *AMG Capital Mgmt., LLC v.
FTC*, 593 U.S. 67, 70 (2021) that the FTC may not seek equitable monetary relief under
Section 13(b).  *See FTC v. Elegant Sols., Inc.*, 2022 WL 2072735, at *2 (9th Cir. June 9,
2022) ("[A]lthough *AMG* held that monetary relief is not available under section 13(b) of
the FTC Act, . . . section 19 of the Act separately and specifically authorizes the FTC to
seek monetary relief to address violations of certain rules, including the TSR, 15 U.S.C. §
57b(a)(1), (b).").  Indeed, numerous courts have granted asset freezes post-*AMG Capital
Mgmt.  See, e.g., FTC v. Panda Ben. Servs., LLC*, 2025 U.S. Dist. LEXIS 94845, at *1
(C.D. Cal. May 14, 2025) (noting TRO entered in 2024); *FTC v. Vision Online, Inc.*,
2024 U.S. Dist. LEXIS 98705, at *3 (M.D. Fla. May 3, 2024) (noting TRO entered in
2023); *FTC v. Green Equitable Sols.*, 2024 U.S. Dist. LEXIS 64326, at *3-4 (C.D. Cal.
Feb. 2, 2024) (noting TRO entered in 2022); *FTC v. Automators LLC*, 2023 U.S. Dist.
LEXIS 150791, at *2 (S.D. Cal. Aug. 25, 2023); *FTC v. BCO Consulting Servs., Inc.*,
2023 U.S. Dist. LEXIS 114437, at *2 (C.D. Cal. May 22, 2023); *FTC v. Fin. Educ.
Servs., Inc.*, 2022 U.S Dist. LEXIS 240887 (E.D. Mich. May 24, 2022) (granting *ex parte*
TRO).

52

order the full range of equitable relief sought by the FTC and can do so on an *ex parte* basis.[24]

**B.    The FTC Meets the Standard for Preliminary Injunctive Relief**

In determining whether to grant a preliminary injunction under Section 13(b), including a temporary restraining order, a district court must weigh: (1) the likelihood of success on the merits, (2) irreparable injury, (3) whether the injunction would cause substantial harm to others (balance of equities), and (4) the public interest.  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1020 (9th Cir. 2016); *see also Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024).  Here, the FTC meets all four factors.[25]

**1.  The FTC Is Likely to Succeed on the Merits**

To demonstrate likelihood of success on the merits, the FTC must make a "prima facie showing of illegality," *FTC v. GTP Mktg., Inc.*, 1990 WL 54788, at *4 (N.D. Tex. Mar. 15, 1990), and "the district court need only . . . find some chance of probable success on the merits" to grant an injunction.  *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987); *accord. FTC v. City West Advantage, Inc.*, 2008 WL 2844696, at *2 (D. Nev. Jul. 22, 2008).  Moreover, in considering an application for a TRO or preliminary injunction, "courts are permitted to consider

---

[24] Numerous courts in this district and throughout the Ninth Circuit have granted similar preliminary relief.  (*See* Decl. FTC Counsel at 12-14 ¶¶ 14-15 and cases cited therein.)
[25] Many courts in the Ninth Circuit relax the four-part standard in FTC cases requiring only a showing of likelihood of success on the merits and a balance of the equities.  *See, e.g.*, *Affordable Media*, 179 F.3d at 1233; *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984); *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019).

hearsay and otherwise inadmissible evidence." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (stating that courts may give inadmissible evidence some weight when doing so "serves the purpose of preventing irreparable harm before trial"); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings."); *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).

As discussed in Section III above, the FTC has presented ample evidence, including declarations from Defendants' customers and documents provided by Defendants to state attorneys general, showing that the FTC is likely to succeed on the merits of its claims that Defendants violated Section 5 of the FTC Act, multiple provisions of the TSR, multiple provisions of the Impersonation Rule, Section 604(f)(1) of the FCRA, and Section 521 of the GLB Act.

### 2. Irreparable Harm Exists

Where, as here, Defendants are charged with violating multiple federal statutes, there is a "presumption of irreparable harm based on a statutory violation." *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120 (2d Cir. 2010); *Consumer Def.*, 926 F.3d at 1212; *Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir. 1991). The passage of the FTC Act, GLB Act, and the Telemarketing Act are "in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained." *United States v. Diapulse Corp of Am.*, 457 F.2d 25, 28 (2d Cir. 1972 (citing *United States v. City and County of San Francisco*, 310 U.S. 16 (1940)). Even without this

54

presumption, as described in detail in Section III above, vulnerable consumers will continue to be injured by Defendants' unlawful debt relief scheme—in addition to paying steep illegal advance fees, Defendants' victims face increased debt due to interest and late fees in following Defendants' instructions to stop paying their debts, they are at risk of lawsuits or other collections actions by their creditors, and their credit scores are significantly decreased. Without the requested relief, the public will suffer irreparable harm from the continuation of Defendants' scheme. And as discussed in more detail in Section V.B below, "[d]issipation of assets can create a likelihood of irreparable harm." *Goldwater Bank, N.A. v. Elizarov,* 2023 U.S. App. LEXIS 1877, at \*4 (9th Cir. Jan. 25, 2023); *McGirr v. Rehme,* 891 F.3d 603, 613-14 (6th Cir. 2018) ("concealment and dissipation of assets likely obtained through fraud constitutes irreparable harm for the purposes of issuing a preliminary injunction.") (internal quotes omitted).

### 3. The Equities Weigh in Favor of Granting Injunctive Relief

The public interest in halting Defendants' unlawful conduct outweighs any interest Defendants may have in continuing to unlawfully market their services. *FTC v. World Wide Factors,* 882 F.2d 344, 347 (9th Cir. 1989). In balancing the equities between the public and private interest, "public equities receive far greater weight." *Warner Commc'ns.,* 742 F.2d at 1165. And because Defendants "can have no vested interest in [a] business activity found to be illegal," *Diapulse Corp. of Am.,* 457 F.2d at 29 (internal quotations and citation omitted), a balance of equities tips definitively toward granting the requested relief. *CFTC v. British Am. Commodity Options Corp.,* 560 F.2d 135, 143

(2d Cir. 1977) ("A court of equity is under no duty 'to protect illegitimate profits or advance business which is conducted (illegally).'") (citing *FTC v. Thomsen-King & Co.*, 109 F.2d 516, 519 (7th Cir. 1940)).

The evidence demonstrates that the public equities—protection of consumers from Defendants' unlawful debt relief scheme, effective enforcement of the law, and the preservation of assets—weigh in favor of granting the requested injunctive relief.  In contrast, "there is no oppressive hardship to Defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment." *World Wide Factors*, 882 F.2d at 347.  Because the injunction will preclude only harmful, illegal behavior, the public equities supporting the proposed injunctive relief outweigh any burden imposed by such relief on Defendants. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978).

### 4.  The Public Interest Weighs in Favor of Injunctive Relief

"The public interest in ensuring the enforcement of federal consumer protection laws is strong." *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011); *FTC v. Campbell Cap. LLC*, 2018 U.S. Dist. LEXIS 186728, at *7 (W.D.N.Y. Oct. 24, 2018) (finding "compelling public interest" in halting unlawful practices); *FTC v. Absolute Fin. Servs.*, 2020 U.S. Dist. LEXIS 260869, at *7 (D.S.C. Jul. 17, 2020); *FTC et al. v. Educare Centre Servs., Inc.*, 2020 U.S. Dist. LEXIS 135341, at *15 (W.D. Tex. Apr. 3, 2020); *FTC v. Simple Health Plans, LLC*, 379 F. Supp. 3d 1346, 1364 (S.D. Fla. 2019). In addition, the public interest in halting Defendants' unlawful conduct, preserving

56

evidence, and preserving assets to provide redress to consumers far outweighs any interest Defendants may have in continuing to operate their fraudulent business. Moreover, where, as here, a defendant's conduct "reflects systematic wrongdoing rather than a mere incidental violation, it presents strong grounds for the issuance of a preliminary injunction." *SEC v. Prater*, 289 F. Supp. 2d 39, 54 (D. Conn. 2003).

## C. Defendants Are a Common Enterprise and Jointly and Severally Liable for the Law Violations

Where corporate entities operate together and act as a common enterprise, each may be held liable for the deceptive acts and practices of the others. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010); *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014); *Elegant Sols.*, 2020 WL 4390381, at *11; *OMICS Grp.*, 374 F. Supp. 3d at 1012-13; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *26; *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002); *see also Liu v. SEC*, 591 U.S. 71, 90 (2020) (common law allows joint liability "for partners engaged in concerted wrongdoing"). Where the same individuals transact business through a "maze of interrelated companies," the whole enterprise may be held liable as a joint enterprise. *John Beck Amazing Profits*, 865 F. Supp. 2d at 1082 (quoting *Think Achievement*, 144 F. Supp. 2d at 1011). When determining whether a common enterprise exists, courts consider "common control; the sharing of office spaces and officers; whether business is transacted through a maze of interrelated companies; the

57

commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants." *Grant Connect*, 827 F. Supp. 2d at 1216; *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *26; *J.K. Publ'ns.*, 99 F. Supp. 2d at 1202. Of these factors, "no one factor is controlling." *FTC v. Consumer Health Benefits Ass'n*, 2011 U.S. Dist. LEXIS 92389, at *16 (E.D.N.Y. Aug. 18, 2011). Rather, "the pattern and frame-work of the whole enterprise must be taken into consideration." *Del. Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964).

As discussed in Section II.B above, Defendants form a classic common enterprise, the touchstone of which is operating through a "maze of interrelated companies" operated by the Individual Defendants. The Corporate Defendants share addresses, ownership, and employees. The Corporate Defendants also use identical or similar representations to lure consumers and use nearly identical customer agreements. Further, the Corporate Defendants routinely transfer funds to the Individual Defendants. Accordingly, each Defendant can be held liable for the actions of the whole.

**D. The Individual Defendants Are Liable for Injunctive and Monetary Relief**

As the controlling forces behind Defendants' scheme, the Individual Defendants are liable for the law violations committed by the Corporate Defendants. To establish individual liability for injunctive relief based on corporate violations of the FTC Act, the FTC must show that the individual participated directly in the violative acts or practices or had authority to control the corporate actors. *Network Servs. Depot*, 617 F.3d at 1138

58

n.9 (citing *Publ'g Clearing House*, 104 F.3d at 1170). In general, an individual's status as an officer, or as someone with the authority to sign documents on the corporation's behalf, gives rise to a presumption of authority to control a small closely held corporation. *Publ'g Clearing House*, 104 F.3d at 1170-71; *see also FTC v. Amy Travel Servs., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989), *overruled on other grounds by FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 767 (7th Cir. 2019). Bank signatory authority or acquiring services on behalf of a corporation also evidences authority to control. *See FTC v. USA Fin., LLC*, 415 F. App'x 970, 974-75 (11th Cir. 2011). "Individual liability for injunctive relief under the Act has no mental state requirement." *Network Servs. Depot*, 617 F.3d at 1138 n.9.

An individual is further liable for monetary relief for corporate practices if the individual had, or should have had, knowledge or awareness of the corporate defendant's misrepresentations. *Elegant Sols.*, 2022 WL 2072735, at *2; *Network Servs. Depot*, 617 F.3d at 1138-39; *FTC v. Noland*, 2021 WL 4127292, at *29 n.17 (D. Ariz. Sept. 9, 2021) (holding that this test applies to rules like the TSR "because violations of those rules are themselves unfair or deceptive acts or practices under § 5(a) by operation of 15 U.S.C. § 57a(d)(3)"). This knowledge element, however, need not rise to the level of subjective intent to defraud consumers. *Affordable Media*, 179 F.3d at 1234; *Amy Travel Servs.*, 875 F.2d at 574. Instead, the FTC need only demonstrate that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of fraud coupled with an

59

intentional avoidance of the truth. *FTC v. Com. Planet*, 815 F.3d 593, 600 (9th Cir. 2016); *Network Servs. Depot*, 617 F.3d at 1138-39; *Stefanchik*, 559 F.3d at 931. "The extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *Affordable Media*, 179 F.3d at 1235 (control over corporate defendant "establishe[d] strong evidence of [individual defendants'] knowledge"); *Amy Travel Servs.*, 875 F.2d at 574 ("[T]he degree of participation in business affairs is probative of knowledge."). When a common enterprise is present, an individual's liability for monetary relief is joint and several with all entities participating in the enterprise. *See FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1213-14 (N.D. Ga. 2008), *aff'd*, 356 Fed. Appx. 358 (11th Cir. 2009).

Here, as discussed above, the Individual Defendants have authority to control, and knowledge of, Defendants' wrongful acts. As discussed in Section II.B above, they are the principal officers of the Corporate Defendants. They have signatory authority over the Corporate Defendants' financial accounts and are the points of contact for Defendants' service providers. They have served as the Corporate Defendants' authorized representative for state filings. Accordingly, the Individual Defendants are liable for injunctive and monetary relief.

## V.    THE SCOPE OF THE PROPOSED *EX PARTE* TRO IS NECESSARY AND APPROPRIATE

The FTC requests that the Court grant a TRO that includes conduct relief, asset preservation, a temporary receiver, immediate access to business locations, and limited access by the receiver to personal residences. Courts in this district and throughout the

Ninth Circuit have routinely granted this relief in similar cases. (*See* Decl. FTC Counsel at 11-13 ¶¶ 11-12 and cases cited therein.) The evidence shows that the FTC is likely to succeed in proving that Defendants have been engaging in deceptive and unfair practices in violation of the FTC Act, the TSR, the Impersonation Rule, the FCRA, and the GLB Act, and that the balance of the equities strongly favors the public. Preliminary injunctive relief, including a temporary restraining order, is thus justified.

### A. Conduct Relief Is Necessary to Stop Ongoing Consumer Harm

To prevent ongoing consumer injury, the proposed TRO prohibits Defendants from making deceptive debt relief representations and collecting unlawful advance fees. These measures simply require Defendants to comply with the law and are squarely within the Court's injunctive authority under Section 13(b) of the FTC Act.

### B. Asset Preservation Is Necessary to Preserve the Possibility of Final Relief

An asset freeze is appropriate once the Court determines that the FTC is likely to prevail on the merits of a Section 19 claim and the refund of money would be an appropriate final remedy. *See Noland*, 2021 WL 4318466, at *5; *see also World Travel Vacation Brokers*, 861 F.2d at 1031 (When a district court determines that the FTC is likely to prevail in a final determination on the merits, it has "a duty to ensure that . . . assets . . . [are] available to make restitution to the injured customers"). "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009); *see also Affordable Media*, 179 F.3d at 1236-37.

Courts have found a strong likelihood that a defendant's assets will be dissipated during the pendency of a case where the business is permeated by fraud. *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974); *SEC v. Manor Nursing Ctr., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972); *see also H.N. Singer, Inc.*, 668 F.2d at 1113; *FTC v. Willms*, 2011 WL 4103542, at *11 (W.D. Wash. Sept. 13, 2011); *FTC v. Int'l Comput. Concepts, Inc.*, 1994 WL 730144, at *16-17 (N.D. Ohio Oct. 24, 1994). As the Ninth Circuit has observed in upholding an asset freeze, an individual who has "impermissibly awarded himself" funds that are not rightfully his, "is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment." *Johnson*, 572 F.3d at 1085.

Further, this Court has the authority to direct third parties to effectuate the purpose of the TRO. *See, e.g., Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (courts have authority to direct third parties to preserve assets); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 130-33 (2d Cir. 2014) (courts have equitable power to impose asset freeze and accounting where plaintiff is pursuing a claim for equitable relief). Further, the Court can order Defendants' assets to be frozen whether the assets are inside or outside the United States. *See United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control, whether the property be within or without the United States.").

Without an asset freeze, the dissipation of assets is likely. Defendants who have engaged in illegal activities are likely to waste assets prior to resolution of the action. *See Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 628 (6th Cir. 2013) (asset freeze injunction appropriate where defendant's "questionable financial transactions" foreshadowed a fraudulent dissipation of assets). Moreover, the risk is heightened where, as here, "[t]he scope of the monetary liability for Defendants' unlawful conduct is enormous and provides considerable motivation for defendants to place their assets beyond the Court's reach." *FTC v. USA Beverages, Inc.*, 2005 U.S. Dist. LEXIS 39075, at *24-25 (S.D. Fla. Dec. 5, 2005). Indeed, in the FTC's experience, defendants engaged in similar unlawful practices secreted assets upon learning of an impending law enforcement action. (*See* Decl. FTC Counsel at 5-10 ¶ 12.)

Here, Defendants' debt relief scheme is wholly premised on collecting fees from consumers for services they fail to deliver. They falsely impersonate both government and businesses. And they illegally obtain consumers' credit reports. Defendants' bank records show that during the three years before the FTC filed its Complaint, Defendants collected over $104 million from consumers. (PX25 at 60 ¶ 132 & Table 13.)

On top of paying themselves generous salaries, the Individual Defendants have used the funds in the Corporate Defendants' depository accounts to fund their personal lifestyle at the expense of consumers who were scammed. Bank records show millions of dollars of corporate funds used to pay personal credit cards, mortgage payments, and personal income taxes, as well as over $130,000 for various automobiles and $90,000 in

travel.  (PX25 at 64 ¶ 144.)  And Defendants have transferred over $25 million to

Pakistani banks (*Id*. at 63 ¶ 140), as well as over $3 million to companies owned by a

person who has since pled guilty to healthcare fraud.  (*Id*. ¶ 143.)  Therefore, an asset

freeze over individual and corporate assets is required to preserve the funds derived from

Defendants' unlawful activities so that the Court can retain its ability to fashion

meaningful final relief.[26]

### C. A Receiver Is Necessary to Prevent Further Consumer Harm and Locate and Preserve Business Assets and Records

The appointment of a receiver is a sound equitable remedy in cases involving

deception.  *In the Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1997).  This Court

has the authority to appoint a receiver when, as here, the FTC has established that it is

likely to succeed on a Section 19 claim for monetary relief, and the receiver is necessary

to preserve funds for future monetary judgment. S*imple Health Plans*, 58 F.4th at 1329-

30; *Noland*, 2021 WL 4318466, at *5.  It also has authority to appoint a receiver if, as is

the case here, "the purpose of the receivership is to prevent the same sort of ongoing

harm that the ultimate object of the § 13(b) litigation—the issuance of a permanent

injunctions—is intended to achieve." *Noland*, 2021 WL 4318466, at *4.  A receiver is

---

[26] The FTC also requests that the Court order Defendants to complete and return to the FTC financial statements on the forms attached to the proposed TRO.  Financial statements, combined with an asset freeze, will increase the likelihood of preserving existing assets pending final determination of this matter. *See, e.g.*, *FTC v. D Squared Sols., LLC*, 2003 WL 22881377, at *4 (D. Md. Oct. 30, 2003) (ordering immediate accounting of assets); *FTC v. Stout*, 1999 WL 34833240, at *3 (D.N.J. Dec. 8, 1999); *see also SEC v. Bankers All. Corp.*, 881 F. Supp. 673, 676 (D.D.C. 1995); *SEC v. Parkersburg Wireless LLC*, 156 F.R.D. 529, 532 n.3 (D.D.C. 1994).

necessary when a corporate defendant has defrauded the public. *SEC v. First Fin. Grp. of Texas*, 645 F.2d 429, 438 (5th Cir. 1981) ("[I]t is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of (the corporate defendant's) affairs. . . ." (quoting *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963)).

If Defendants are allowed to remain in control of their business, they are likely to destroy evidence and dissipate the fruits of their fraud. *See SEC v. R. J. Allen & Assoc., Inc.*, 386 F. Supp. 866, 878 (S.D. Fla. 1974) ("[T]he appointment of a receiver is necessary to prevent diversion or waste of assets to the detriment of those for whose benefit, in some measure, the injunction action is brought."). (*See also* Decl. FTC Counsel at 10-12 ¶ 13.) A neutral receiver would prevent further harm to consumers and would locate and secure assets and records without disrupting any legitimate business activity. A receiver would also help assess the extent of the fraud, trace its proceeds, prepare an accounting, and make an independent report of Defendants' activities to the Court.

**D. Immediate Access and Limited Expedited Discovery Are Appropriate**

To facilitate the FTC's and the receiver's efforts to locate documents and assets related to Defendants' unlawful activities, the FTC seeks leave of Court for limited discovery to locate and identify documents and assets and to allow the FTC and the receiver immediate access to Defendants' business premises. District courts are authorized to depart from normal discovery procedures and fashion discovery to meet

65

discovery needs in particular cases. Federal Rules of Civil Procedure 26(d), 30(a)(2),

33(a), and 34(b) authorize the Court to alter the standard provisions, including applicable

time frames, that govern depositions and production of documents. This type of

discovery order reflects the Court's broad and flexible authority in equity to grant

preliminary relief in a case involving the public interest. *See Porter v. Warner Holding*,

328 U.S. 395, 398 (1946); *FSLIC v. Dixon*, 835 F.3d 554, 562 (5th Cir. 1987); *Fed.

Express Corp. v. Fed. Espresso, Inc.*, 1997 U.S. Dist. LEXIS 19144, at *6 (N.D.N.Y.

Nov. 24, 1997) (early discovery "will be appropriate in some cases, such as those

involving requests for a preliminary injunction") (quoting commentary to Fed. R. Civ. P.

26(d)).

Here, as discussed in Section II.B above, it appears that much of Defendants'

operations is conducted remotely and that the Individual Defendants control the scheme

from their personal residences. For example, an examination of IP information indicates

that Defendant Reaney logs in to Defendants' financial accounts multiple times per day

from her residence. (PX25 at 20 ¶¶ 64-65, Att. DD at 364.) Meanwhile, Defendants

Lakes and Knechtel routinely list their personal residences as the "office address" for

many of the Corporate Defendants. (*Id.* at 20 ¶¶ 66-67, Att. B at 117, Att. C at 139, Att.

F at 188, 192, Att. I at 206, 211, Att. J at 225, Att. K at 231-34, 241, 244, Att. P at 271-

73, Att. R at 281.) Accordingly, in addition to formal business premises, the proposed

TRO would allow the Court-appointed receiver immediate access to the Individual

Defendants' personal residences for the limited purpose of inventorying and removing

66

assets and documents of the Corporate Defendants and make forensic images of any computer, mobile phone, or other mobile device that the Individual Defendants use to conduct business.  Such relief has been granted in other FTC cases.  *See FTC et al. v. Treashonna Graham*, Case No. 3:22-cv-00655-MMH-JBT (M.D. Fla. Jun. 21, 2022) (ECF No. 19); *FTC v. Ecological Fox, LLC*, Case No. 1:18-cv-03309-PJM (D. Md. Nov. 5, 2018) (ECF No. 13); *FTC v. Kutzner*, Case No. 8:16-cv-00999-DOC-AFM (C.D. Cal. Oct. 19, 2016) (ECF No. 130).

### E. The TRO Should Be Issued Without Notice to Defendants to Preserve the Court's Ability to Fashion Meaningful Relief

The substantial risk of asset dissipation and document destruction in this case, coupled with Defendants' ongoing and deliberate statutory violations, justifies non-noticed relief.  Federal Rule of Civil Procedure 65(b) permits this Court to grant a TRO without notice if it appears notice will result in "irreparable injury, loss, or damage" and the applicant certifies the reason why.  Fed. R. Civ. P. 65(b); LRCiv 65.1.  Issuing the *ex parte* TRO without notice in this case is indispensable to preserving the status quo, including securing assets needed to provide full and effective relief pending a hearing on the preliminary injunction.  *Ex parte* orders are proper in cases "where such notice would render fruitless the further prosecution of the action."  *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993); *In re Vuitton et Fils*, 606 F.2d at 4-5; *see also AT&T Broadband v. Tech Commc'ns.*, 381 F.3d 1309, 1319 (11th Cir. 2004); *Cenergy Corp. v. Bryson Oil & Gas P.L.C.*, 657 F. Supp. 867, 870 (D. Nev. 1987) (noting that

67

given the pervasive deception in the case, "it [is] proper to enter the TRO without notice, for giving notice itself may defeat the very purpose for the TRO").

As discussed above, Defendants' business operations are permeated by unlawful practices. Moreover, as detailed by the FTC's investigator (who is a Certified Fraud Examiner (PX25 at 1 ¶ 3)), Defendants carry out their operations to avoid law enforcement scrutiny, including by using multiple names and addresses, addresses where they have no physical connection, and shell companies to move funds. (*Id*. at 64-68 ¶¶ 145-153.) Further, the FTC's experience shows that defendants engaged in fraudulent schemes similar to Defendants often withdraw funds from bank accounts and move or shred documents upon learning of impending legal action. (*See* Decl. FTC Counsel at 5-12 ¶¶ 12-13 (citing numerous instances where FTC defendants have dissipated assets or destroyed evidence when given notice of the FTC action).) Defendants' conduct— including making hundreds of thousands of dollars in withdrawals and transfers to the Individual Defendants' accounts and individually-held LLCs and transferring large sums overseas—and the nature of Defendants' illegal scheme makes it is highly likely that Defendants would conceal or dissipate assets absent non-noticed relief. Courts therefore have regularly granted the FTC *ex parte* relief in similar cases.[27] (*See* Decl. FTC

---

[27] Indeed, Congress has looked favorably on the availability of *ex parte* relief under the FTC Act: "Section 13 of the FTC Act authorizes the FTC to file suit to enjoin any violation of the FTC [Act]. The FTC can go into court *ex parte* to obtain an order freezing assets, and is also able to obtain consumer redress." S. Rep. No. 130, 103rd Cong., 2d Sess. 15-16, *reprinted in* 1994 U.S. Code Cong. & Admin. News 1776, 1790-91.

Counsel at 12-14 ¶¶ 14-15 and cases cited therein.)  Non-noticed TROs are granted to serve the "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974)).

## VI.    CONCLUSION

The FTC asks the Court to halt the unlawful practices of a scheme that has defrauded consumers of over $90 million.  Defendants prey on consumers, particularly senior citizens, by exploiting their trust in financial institutions and the government, manipulating their fear of losing their hard-earned good credit, and then actually causing them grave financial harm.  The FTC has already marshaled evidence demonstrating that it will likely succeed on the merits at trial.  Immediate relief is necessary to prevent continued harm to the public and preserve assets to ensure effective relief.  For the foregoing reasons, the FTC requests that the Court enter the proposed TRO.

Dated:  July 14, 2025                               Respectfully submitted,

GREGORY A. ASHE (VA Bar No. 39131)
BENJAMIN R. CADY (NY Bar No. 5133582)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20850
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-2939 (Cady)
Email: gashe@ftc.gov, bcady@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

69