GREGORY A. ASHE (VA Bar No. 39131)
BENJAMIN R. CADY (NY Bar No. 5133582)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20850
Telephone: 202-326-3719 (Ashe)
Telephone: 202-326-2939 (Cady)
Email: gashe@ftc.gov, bcady@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**SEALED**

FILED ___ LODGED ✓
RECEIVED ___ COPY

JUL 1 4 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Federal Trade Commission,** | CASE NO. **CV25-02443-PHX-SMB** |
| Plaintiff, | |
| v. | **RULE 65 CERTIFICATION AND DECLARATION OF FTC COUNSEL IN SUPPORT OF THE FTC'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| **Accelerated Debt Settlement Inc.**, et al., | |
| Defendants. | |
| | **DOCUMENT SUBMITTED UNDER SEAL** |

I, Gregory A. Ashe, declare as follows:

1. I am over twenty-one years of age and a citizen of the United States. I am an attorney employed by and representing the Federal Trade Commission ("FTC"), an agency of

the United States government, in this case. I am authorized to appear in this case on behalf of the FTC pursuant to LRCiv 83.1(b)(1).

2. I am a member in good standing of the bars of the Commonwealth of Virginia and the District of Columbia. I am also admitted to practice in the United States Court of Appeals for the Fourth Circuit, the United States District Court for the Eastern District of Virginia, the United States District Court for the District of Columbia, and the United States District Court for the Northern District of Georgia.

3. My business address is 600 Pennsylvania Avenue, NW, Washington, D.C., 20580. Unless stated otherwise, I have personal knowledge of the facts stated herein and, if called as a witness, would competently testify thereto.

4. Pursuant to Federal Rule of Civil Procedure 65(b), LRCiv 65-1, and LRCiv 5.6, the FTC has applied for an *ex parte* temporary restraining order with an asset freeze, appointment of a receiver, and other equitable relief ("TRO Motion"), as well as an *ex parte* motion for an order temporarily sealing the case file under LRCiv 5.6 ("Seal Motion"). This declaration sets forth the facts and reasons for granting relief without notice to Defendants under Fed. R. Civ. P. 65(b)(1).

5. The FTC is not aware that any Defendant in this matter is represented by counsel in this matter. In connection with a 2024 investigation and enforcement action by the State of Minnesota, Defendants Accelerated Debt Settlement Inc. and Financial Solutions Group LLC were represented by Jackson Evert, Esq. of Forsgren Fisher McCalmont DeMarea Tysver LLP of Minneapolis, Minnesota. In connection with a 2024 investigation and enforcement action by the Commonwealth of Pennsylvania,

Defendants Accelerated Debt Settlement Inc. and Financial Solutions Group LLC were represented by Robby Birnbaum, Esq. of Greenspoon Marder LLP of Fort Lauderdale, Florida.

6. The FTC has not attempted to provide notice to Defendants—nor should notice be required—for the reasons set forth herein.

7. Under Fed. R. Civ. P. 65(b), the Court may issue a temporary restraining order ("TRO") without notice to the defendants if the facts show that immediate and irreparable injury will result to the applicant if notice is given and the applicant "certifies in writing any efforts made to give notice and the reasons why it should not be required." Under LRCiv 65.1, *ex parte* restraining orders shall only issue in accordance with Fed. R. Civ. P. 65. This declaration sets forth the reasons why notice should not be required.

8. Issuance of an *ex parte* TRO under Rule 65(b) is appropriate to serve the "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 439, 94 S. Ct. 1113, 1124 (1974)). The Ninth Circuit has noted that it is proper for district courts to issue *ex parte* TROs where the movant can show it is likely that the defendants' actions will render further prosecution of the case fruitless. *Reno Air Racing Ass'n*, 452 F.3d at 1131 (citing *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1984)); *In re Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2nd Cir. 1979). The movant can support its assertion by showing that, based on past

experience, defendants, or persons similar to defendants, have a history of disposing of evidence or violating court orders and, therefore, are likely to engage in such conduct. *Reno Air Racing Ass'n*, 452 F.3d at 1131.

9. The evidence set forth in the FTC's TRO Motion, and in the accompanying declarations and exhibits, shows that Defendants have engaged in a concerted course of deceptive practices in connection with the marketing and sale of debt relief services. Defendants have violated and are continuing to violate (1) Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), (2) the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, (3) the FTC's Trade Regulation Rule on Impersonation of Government and Businesses ("Impersonation Rule"), 16 C.F.R. Part 461, (4) Section 604(f)(1) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681b(f)(1), and (5) Section 521(a) of the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. § 6821(a).

10. To the best of the FTC's knowledge, Defendants are not aware of the FTC's investigation into these violations, or that the FTC is seeking equitable and monetary relief from them. The pervasive nature of Defendants' unlawful behavior and attempts to conceal their identities as the individuals responsible for that behavior demonstrates a likelihood that they will dissipate or conceal assets and destroy or conceal evidence of their unlawful conduct if they are notified of the FTC's intention to seek equitable and monetary relief.

11. As detailed in the declaration of FTC Investigator Michael Goldstein filed as an exhibit to the FTC's TRO Motion (as PX25), Defendants' operation displays many of

the indicators of a scheme to defraud consumers including (1) avoiding law enforcement scrutiny, (2) maintaining false credibility with their victims, (3) obtaining and maintaining the ability to process consumer payments, and (4) once consumer payments are processed, obtaining and maintaining the ability to move those funds. (PX25 at 64-68 ¶¶ 145-153.) Defendants also move significant amounts of funds from corporate accounts to personal accounts and to accounts offshore. (PX25 at 61-64 ¶¶ 133-144.)

12. Further, as illustrated by the following examples provided on information and belief, it has been the FTC's experience that FTC defendants who have engaged in deceptive schemes and who receive notice of the filing of an action by the FTC or of the FTC's intent to file an action alleging consumer decption, often attempt to undermine the FTC's efforts dissipating or concealing assets:

   a. In *FTC v. Blackrock Servs., Inc.*, Case No. 8:25-cv-00363-HDV-ADS (C.D. Cal. 2025), the FTC sought and obtained an *ex parte* TRO with a receivership and asset freeze. Upon learning of the order, one individual defendants admitted to transferring $44,000 from a personal account. Another individual defendant transferred $13,000 using Zelle from his personal account. Subsequently, the court-appointed receiver was able to recover those funds.

   b. In *FTC v. Global Circulation, Inc.*, Case No. 1:24-cv-04927-TCB (N.D. Ga. 2024), the FTC sought and obtained an *ex parte* TRO with a receivership and asset freeze. After learing of the FTC action but before he was served, the individual defendant transferred $20,000 from a corporate account to his mother. Subsequently, the court-appointed receiver was able to recover those funds.

   c. In *FTC v. BCO Consulting Servs., Inc.*, No. 23-cv-0699-JWH (C.D. Cal. 2023), the FTC sought and obtained an *ex parte* TRO with a receivership and asset freeze. Upon learning of the order, one individual defendant went straight to the bank and withdrew $15,000 in cash from a corporate bank account. The defendant only returned the funds upon threat of possible enforcement action by the FTC.

d. In *FTC v. Cardiff*, No. 18-cv-2104-DMG-PLA (C.D. Cal. 2020), the FTC sought and obtained an *ex parte* TRO with a receivership and asset freeze over a business owned and controlled by an individual defendant who was already under an asset freeze and personal receivership. When he received actual notice of the temporary restraining order, but before he was served, the individual defendant rushed to his bank and withdrew $30,000 in cash and money orders from an account in the name of another company he wholly owns and controls.

e. In *FTC and the State of Georgia v. Laptop and Desktop Repair, LLC*, Case No. 1:16-CV-3591-AT (N.D. Ga. 2016), the FTC sought and obtained an *ex parte* TRO with an asset freeze. After learning that the TRO had been granted, one defendant immediately withdrew money and transferred it to a non-defendant limited liability company. On the day that the court entered a preliminary injunction with an asset freeze, the same defendant withdrew $103,369 from his personal, online brokerage account and transferred the money to another personal acco

f. In *FTC v. Goldman Schwartz Inc.*, Case No. 13-cv-00106 (S.D. Tex. 2013), the FTC obtained an *ex parte* TRO with an asset freeze against numerous corporate and individual defendants, including the companies' owner. Within an hour of being served with the TRO, but before the asset freeze had been fully implemented, the owner withdrew approximately $268,000 from a frozen corporate account. Shortly thereafter, the owner sold approximately $160,000 in securities held in a personal trading account. The next day, the owner's wife withdrew another $18,500 from a non-defendant corporation's account that was subject to the asset freeze. Because the court had issued its asset freeze in advance of these actions, the FTC and a court-appointed monitor were able to recover all of the mon

g. In *FTC v. Lakhany*, Case No. 12-337-CJC (C.D. Cal. 2012), the day after the court granted the TRO, but before the FTC could effect service, the defendant's employee notified the defendant of the FTC's lawsuit and receivership. The individual defendant proceeded to withdraw $204,000 from corporate bank accounts in violation of the asset freeze. The defendant later stipulated to contempt, and the majority of the funds were recov

h. In *FTC v. E.M.A. Nationwide, Inc.*, No. 12-cv-2394 (N.D. Ohio 2012), the court denied the FTC's request for an *ex parte* TRO with an asset freeze and required the FTC to serve the defendants before holding a preliminary injunction hearing. The FTC served the defendants on September 28, 2012, and by October 4, 2012 the individual defendants had withdrawn more than $152,000 from a corporate bank account, using the funds to retain attorneys in Canada and Miami, to prepay

one individual defendant's apartment rent for three months, and to have cash on hand before stipulating to a preliminary injunction with an asset freeze.

i.  In *FTC v. Prime Legal Plans,* No. 12-cv-61872 (S.D. Fla. 2012), upon hearing that the TRO had been granted, the defendants went straight to the bank and transferred $1.7 million in assets to one of the defendants' girlfriend and mother. The bank was able to claw most of it back, but the FTC, and thus consumers, ended up losing approximately $200,000.

j.  In *FTC v. Fereidoun "Fred" Khalilian,* Case No. 1:10-cv-21788-MGC (S.D. Fla. 2010), the FTC sought and obtained an *ex parte* TRO with an asset freeze. Before the asset freeze could be processed by the banks, one of the defendant's employees withdrew large amounts of money from the company's bank accounts. The defendant eventually returned some, but not all, of the money. Additionally, the defendant attempted to remove assets located in his personal residence. The receiver, however, was monitoring the defendant's residence, and, after observing people taking a number of items from the defendant's residence at night, was able to halt the defendant's activities.

k.  In *FTC v. Data Medical Capital, Inc.,* Case No. 8:99-cv-01266-AHS-EE (C.D. Cal. 2009), the FTC moved for contempt and an *ex parte* TRO and asset freeze against certain defendants. One defendant learned of the FTC's contempt investigation and transferred approximately $1 million to a personal bank account before the FTC filed.

l.  In *FTC v. Latrese & Kevin Enters., Inc.,* Case No. 3:08-01001-MMH-JRK (M.D. Fla. 2008), the FTC sought and obtained an *ex parte* TRO with an asset freeze in conjunction with a motion to show cause why the defendants should not be held in contempt. After being personally served with the TRO, one defendant withdrew $17,800 from a frozen bank account the same day. To avoid being held in contempt of the TRO, the defendant returned all but a few thousand dollars.

m.  In *FTC v. Connelly,* No. 06-cv-701-DOC-RNB (C.D. Cal. 2006), upon learning of the FTC's action, three defendants withdrew at least $800,000 from their bank accounts, most of which was never recovered.

n.  In *FTC v. Global Mktg. Group, Inc., et al.,* No. 06 CV 2272 (M.D. Fla. 2006), the FTC obtained an *ex parte* TRO with an asset freeze and served the order on banks where the defendants were known or suspected to have accounts. After being served with the TRO, one defendant successfully withdrew over $500,000 from accounts previously unknown to the FTC. Most of these funds were wired to offshore bank accounts. The defendant was ultimately held in contempt and fled the country after failing to appear at a show cause hearing.

o. In *FTC v. Universal Premium Servs., Inc.*, Case No. 2:06-cv-00849-GW-OP (C.D. Cal. 2006), a defendant and his wife withdrew over $45,000 from their joint personal bank account hours after learning of the FTC's action.

p. In *FTC v. World Traders Ass'n,* No. 05-cv-591-AHM-CT (C.D. Cal. 2005), upon learning of the TRO, the defendants appropriated $90,459 from their bank account, none of which was recovered.

q. In *FTC v. Am. Entm't. Distribs., Inc.*, Case No. 1:04-cv-22431-JEM (S.D. Fla. 2004), the Court entered an asset freeze that froze assets of ten corporate and individual defendants. Within hours of receiving notice of the asset freeze, one of the individual defendants withdrew $39,500 from his bank. Because the asset freeze had been in place, the FTC was able to compel the individual defendant to return the mon

r. In *FTC v. Nat'l Consumer Council,* No. 04-cv-474 (C.D. Cal. 2004), the court granted the FTC's *ex parte* TRO with asset freeze and a temporary receiver against all but one of the corporate defendants. One of the individual defendants then deleted key electronic files on defendants' shared network server by accessing his account through a computer controlled by the corporate defendant not under receivership.

s. In *FTC v. Unicyber Tech., Inc., et al.*, No. CV04-1569 LGB (C.D. Cal. 2004), the FTC obtained an *ex parte* TRO with asset freeze and appointment of a receiver. Shortly after the defendant was served with the TRO, he called his wife, who, at his direction, violated the asset freeze by transferring $405,000 of corporate funds to her father. With the assistance of the receiver, the FTC was able to recover these funds.

t. In *FTC v. 4049705 Canada Inc., et al.*, No. 04 C 4694 (N.D. Ill. 2004), Canadian authorities executed a search warrant on the business premises of Canadian defendants. The FTC subsequently filed its complaint, and its motion for a TRO with asset freeze, and provided notice to the defendants. The FTC subsequently discovered only through its own investigation that the defendants had made several transfers totaling approximately $70,000 after receiving notice of the FTC's action but before the asset freeze was imposed. The FTC was unable to recover the $70,000. The individual defendant was later held in contempt for transferring real estate in violation of the court-imposed asset freeze.

u. In *FTC v. QT, Inc., et al.*, No. 03 C 3578 (N.D. Ill. 2003), the FTC obtained an *ex parte* TRO with asset freeze and when served with the TRO, the defendants

immediately violated the order by withdrawing and transferring substantial sums of money from several bank accounts, totaling more than $2 million in one day.

v. In *FTC v. Check Investors, Inc.*, Case 2:03-cv-02115-KSH-PS (D.N.J. 2003), the filed for an *ex parte* TRO with asset freeze. The Court required that the FTC give the defendants 24 hours' notice before holding a hearing on the FTC's motion. At the conclusion of the hearing, the Court granted the FTC's motion and ordered the defendants' assets frozen. Documents obtained during discovery showed that the defendants had purchased approximately $650,000 in gold coins, bullion, and certificates, of which only approximately $192,000 was found. Records showed that on May 19, 2013, the same day that the Court entered the TRO, the individual defendant's wife visited their safe deposit box. The remaining gold was never recovered.

w. In *FTC v. Assail Inc.*, Case No. 6:03-cv-0007-WSS (W.D. Tex. 2003), the court issued an *ex parte* TRO, including an asset freeze. The lead defendant nonetheless transferred $200,000 within hours of being served with the TRO, which, after contempt proceedings and a lengthy appeal, the defendant was required to repay.

x. In *FTC v. Bay Area Bus. Council, Inc., et al.*, No. 02 C 5762 (N.D. Ill. 2002), as soon as the Court entered a final order for more than $12 million, the defendants took advantage of the termination of a nearly two-year-old asset freeze and immediately withdrew nearly all of their assets from their accounts before the FTC was able to obtain a turnover order.

y. In *FTC v. The Tungsten Group,* No. 2:01-CV-00773-RAJ (E.D. Va. 2001), the FTC obtained an *ex parte* TRO with an asset freeze. One defendant wired money out of a frozen account before the freeze could be imposed by the bank, but later returned it on advice of counsel. Another defendant tried to withdraw cash from a frozen account immediately after being served with the TRO, but he was blocked by the asset freeze.

z. In *FTC v. SkyBiz.com, Inc.*, Case No. 4:01-cv-00396-CVE-FHM (N.D. Okla. 2001), within days of the service of the TRO with an asset freeze provision, one of the primary defendants convinced an overseas trustee to withdraw $1 million from the offshore account of a foreign affiliate. Because a domestic correspondent bank had been served with the TRO, it refused to transfer the funds. The money in the offshore account was preserved, and ultimately used to provide $20 million for consumer redress.

aa. In *FTC v. Consumer Repair Servs., Inc.*, Case No. 2:00-cv-11218-FMC-RZ (C.D. Cal. 2000), after defendants were notified of a TRO and asset freeze against them,

they violated the order by withdrawing over $17,000 from accounts that were not yet frozen.

bb. In *FTC v. World Class Network, Inc.*, Case No. 9:97-00162-AHS-EE (C.D. Cal. 1997), two of the defendants withdrew from the bank, spent, and/or hid $202,000 in assets after learning of the action. Another defendant's spouse withdrew over $100,000 and left the state to open and to deposit funds into an out-of-state account.

cc. In *FTC v. O'Day*, Case No. 6:94-cv-01108-ACC (M.D. Fla. 1994), the court denied the request for an *ex parte* TRO with an asset freeze and scheduled a noticed hearing. Within hours of notice of the hearing, one individual defendant withdrew approximately $200,000 from his bank account, thereby making it difficult for the FTC to preserve those funds for consumer redress.

dd. In *FTC v. United Consumer Servs.*, Case No. 1:94-cv-3164-CAM (N.D. Ga. 1994), a defendant received advance notice of an FTC action and withdrew $100,000 after a TRO was entered against him. The money was only recovered after the FTC brought an action for contempt against that defendant.

ee. In *FTC v. Am. Nat'l Cellular, Inc.*, No. CV 85-7375 WJR (C.D. Cal. 1985), a defendant learned of the action and immediately withdrew $1.2 million from his bank accounts. The defendant fled California and dissipated the money while living overseas.

13. Further, in the FTC's law enforcement experience, in numerous cases, defendants who learn of any FTC action have destroyed or disposed of business records, as illustrated by the following examples, provided on information and belief:

    a. In *FTC v. Blackrock Servs., Inc.*, Case No. 8:25-cv-00363-HDV-ADS (C.D. Cal. 2025), the FTC sought and obtained an *ex parte* TRO with a receivership and asset freeze. The defendants, who were largely operating out of a personal residence, upon learing of the FTC's case, wiped one of their laptops clean of data, deleted numerous emails, deleted their telcommunications account records, and deleted their Microsoft OneDrive cloud storage account. The receiver subsequently found evidence that one of the individual defendats also offered to pay a vendor to delete an employee chat board.

    b. In *FTC v. Panda Benefit Servs., LLC*, Case No. 8:24-cv-01386-CAS (C.D. Cal. 2024), the FTC obtained an *ex parte* TRO with asset freeze, appointment of receiver, and immediate access to business premises. During the execution of

the immediate access, several of the defendants' employees who had been informed of the TRO stole three laptops from the business premises. Additionally, recordings of the defendants' sales calls that were maintained on a third-party server were deleted at the instruction of one of the individual defendants.

c. In *FTC and the People of the State of New York v. Delaware Solutions LLC*, Case No. 1:15-cv-00875-RJA (W.D.N.Y. 2015), the FTC sought a noticed TRO with asset freeze and immediate access to business premises. The Court ordered that the defendants be given two days notice of the motion and hearing. After being served but before the hearing, surveillance revealed that the defendants spent most of the night before the hearing removing evidencfrom one of their call centers, including a computer server and other equipment. After the TRO was granted, the FTC entered the call center and found it mostly empty.

d. In *FTC v. Asia Pacific Telecom, Inc. et al.*, No. 10-cv-3168 (N.D. Ill. 2010), the FTC obtained an *ex parte* TRO freezing the defendants' assets and prohibiting them from destroying documents. After being served with the TRO, one of the individual defendants, Hans Smit, deleted an email account used to conduct many of the illegal practices at issue in the FTC's complaint. Smit took this step despite being served with a discovery request by the FTC for documents in the account and despite multiple demands from the court-appointed receiver for access to the account. The court ultimately held Smit in contempt for deleting the account in violation of the TRO.

e. In *FTC v. Transcontinental Warranty, Inc., et al.*, No. 09 C 2927 (N.D. Ill. 2009), the FTC did not seek *ex parte* relief or to have the file sealed. Although the Court granted the FTC's motion for a TRO freezing all of the defendants' assets and appointing a receiver over the corporate defendant, merely one day after the case and motion were filed, the defendants and third parties had been given notice of the FTC's intent. When the receiver and counsel for the FTC arrived at the corporate defendant's premises pursuant to the Court order, hundreds of file folders with labels indicating that they contained records of the defendants' most recent transactions were found empty, five computers (including that of the corporate defendant's CFO) were allegedly stolen the night before the receiver and FTC arrived, and various third-party trade debtors of the defendants froze payments due to the corporate defendant, which resulted in extensive litigation involving the receiver and ultimately cost the receivership estate hundreds of thousands of dollars.

f. In *FTC v. Nat'l Consumer Counsel*, No. Case No. 8:04-cv-00474-CJC-JWJ (C.D. Cal. 2004), the court granted the FTC's ex parte TRO with asset freeze

and a temporary receiver against all but one of the corporate defendants. One of the individual defendants then deleted key electronic files on defendants' shared network server by accessing his account through a computer controlled by the corporate defendant not under receivership.

g. In *FTC v. Physicians Healthcare Dev., Inc.*, No. 02-cv-2936 (C.D. Cal. 2002), upon receiving notice of the action, the defendants removed or shredded most of their records and documents, including all customer files.

h. In *FTC v. Leisure Time Mktg., Inc. et al.*, Case No. 6:00-cv-01057-ACC (M.D. Fla. 2000), the court entered a TRO against the defendants with immediate access to the business premises. After an individual defendant was served and acknowledged his understanding that he was to preserve all assets and documents, that defendant ordered individuals to remove boxes of documents from one of the business premises. Fortunately, a police officer assisting the FTC in the immediate access saw this activity, and the FTC was able to contact the defendant's counsel and have the documents returned. That individual defendant also attempted to hide certain documents on the business premises in a room where FTC staff was informed that no business records were stored. Because the FTC had immediate access to the business premises, the FTC found these documents.

i. In *FTC v. Osborne Precious Metals, Inc.*, Case No. 2:92-cv-04194-RMT (C.D. Cal. 1992), the defendants destroyed a number of business records shortly after learning of the action.

j. In *FTC v. Academic Guidance Servs.*, Case No. 3:92-cv-03001-AET (D.N.J. 1992), the defendants discovered that the FTC intended to file a case against them and seek an *ex parte* TRO the following week. The FTC later learned that after this discovery, the defendants promptly leased a document shredder and spent the weekend destroying business records.

k. In *FTC v. Applied Telemedia Eng'g & Mgmt., Inc.*, Case No. 1:91-cv-00635-UU (S.D. Fla. 1991), the FTC filed a noticed application for a TRO. When the FTC's agents arrived at defendants' offices to serve the pleadings, the agents observed the removal of documents from the premises. The FTC has no way of knowing whether any of these documents were ultimately produced.

14. Numerous courts in this District have granted *ex parte* temporary injunctive relief similar to that requested here, including asset freeze, appointment of receiver, and immediate access of business premises. *See, e.g., FTC v. Noland*, Case No. 2:20-cv-

-12-

00047-DWL (D. Ariz. Jan. 13, 2020) (ECF No. 19); *FTC v. Hite Media Grp. LLC*, Case No. 2:18-cv-02221-SPL (D. Ariz. Jul. 17, 2018) (ECF No. 14); *FTC v. Blue Saguaro Mktg. LLC*, Case No. 2:16-cv-03406-SPL (D. Ariz. Oct. 11, 2016) (ECF No. 22); *FTC v. Adver. Strategies, LLC*, Case No. 2:16-cv-03353-DJH (D. Ariz. Oct. 4, 2016) (ECF No. 18); *FTC v. Vemma Nutrition Co.*, Case No. 2:15-cv-01578-JJT (D. Ariz. Aug. 21, 2105) (ECF No. 25); *FTC v. Money Now Funding, LLC*, Case No. 2:13-cv-01583-ROS (D. Ariz. Aug. 13, 2013) (ECF No. 13); *FTC v. Nat'l Card Monitor LLC*, Case No. 2:12:cv-02521-JAJ (D. Ariz. Nov. 27, 2012) (ECF No. 18); *FTC v. Am. Bus. Builders, LLC*, Case No. 2:12-cv-02368-GMS (D. Ariz. Nov. 6, 2012) (ECF No. 19); *FTC v. Ambrosia Web Design LLC*, Case No. 2:12-cv-02248-FJM (D. Ariz. Oct. 22, 2012) (ECF No. 13); *FTC v. ELH Consulting, LLC*, Case No. 2:12-cv-02246-FJM (D. Ariz. Oct. 22, 2012) (ECF No. 10); *FTC. N. Am. Mktg. and Assocs., LLC*, Case No. 2:12-cv-00914-DGC (D. Ariz. May 2, 2012) (ECF No. 16).

15. In addition, numerous other districts within the Ninth Circuit have also granted *ex parte* temporary injunctive relief similar to that requested here, including asset freeze, appointment of receiver, and immediate access of business premises, including:

- the Central District of California, *see, e.g., FTC v. Blackrock Servs., Inc.*, Case No. 8:25-cv-00363-HDV-ADS (C.D. Cal. Feb. 27, 2025) (ECF No. 21); *FTC v. Ascend Capventures Inc.*, Case No. 2:24-cv-07660-SPG-JPR (C.D. Cal. Sep. 13, 2024) (ECF No. 30); *FTC v. Panda Benefit Servs., LLC*, Case No. 8:24-cv-01386-CAS (C.D. Cal. Jun. 24, 2024); (ECF No. 29); *FTC v. Intercontinental Sols. LLC*, Case No. 8:23-cv-01495-SB-JDE (C.D. Cal. Aug. 16, 2023) (ECF No. 20); *FTC v. BCO Consulting Servs.*, Case No. 8:23-cv-00699-JWH-ADS (C.D. Cal. May 3, 2023) (ECF No. 32); *FTC v. SL Fin. LLC*, Case No. 8:23-cv-00698-JWH-ADS (C.D. Cal. May 2, 2023) (ECF No. 23); *FTC v. Green Equitable Solutions*, Case No. 2:22-cv-06499-FLA-MAR (C.D. Cal. Sept. 13, 2022) (ECF No. 25); *FTC v. Elegant Sols., Inc.*, Case No. 8:19-cv-01333-JVS-KES (C.D. Cal. July 8, 2019)

(ECF No. 23); *FTC v. Apex Capital Group LLC*, Case No. 2:18-cv-09573-JFW-JPR (C.D. Cal. Nov. 16, 2018) (ECF No. 16); *FTC v. Impetus Enter., Inc.*, Case No. 8:18-cv-01987-JLS-KES (C.D. Cal. Nov. 13, 2018) (ECF No. 23); *FTC v. Cardiff*, Case No. 5:18-cv-02104-DMG-PLA (C.D. Cal. Oct. 10, 2018) (ECF No. 29); *FTC v. Am. Home Servicing Ctr., LLC*, Case No. 8:18-cv-00597-JLS-KES (C.D. Cal. Apr. 13, 2018) (ECF No. 20); *FTC v. Digital Altitude, LLC*, Case No. 2:18-cv-00729-JAK-MRW (C.D. Cal. Feb. 1, 2018) (ECF No. 34); *FTC v. All Document Preparation LLC*, Case No. 2:17-cv-07048-SJO-KS (C.D. Cal. Sept. 28, 2017) (ECF No. 18); *FTC v. A1 DocPrep, Inc.*, Case No. 2:17-cv-07044-SJO-JC (C.D. Cal. Sept. 28, 2017) (ECF No. 17); *FTC v. M&T Fin. Grp.*, Case No. 2:17-cv-06855-ODW-PLA (C.D. Cal. Sept. 19, 2017) (ECF No. 18); *FTC v. Good EBusiness LLC*, Case No. 2:16-cv-01048-ODW-JPR (C.D. Cal. Feb. 16, 2016) (ECF No. 12); *FTC v. BAM Fin., LLC*, Case No. 8:15-cv-01672-JVS-DFM (C.D. Cal. Oct. 21, 2015) (ECF No. 15); *FTC v. Asset and Capital Mgmt., Inc.*, Case No. 8:13-cv-01107-DSF-JC (C.D. Cal. July 24, 2013) (ECF No. 13);

- the Northern District of California, *see, e.g.*, *FTC v. AH Media Grp., LLC*, Case No. 3:19-cv-04022-JD (N.D. Cal. Jul. 18, 2019) (ECF No. 26);

- the Southern District of California, *see, e.g.*, *FTC v. Automators LLC*, Case No. 3:23-cv-01444-DMS-BGS (S.D. Cal. Aug. 11, 2023) (ECF No. 8); *FTC v. Triangle Media Corp.*, Case No. 3:18-cv-01388-TWR-DDL (S.D Cal. Jun. 29, 2018) (ECF No. 11); and

- the District of Nevada, *see, e.g.*, *FTC v. Superior Servicing LLC*, Case No. 2:24-cv-02163-GMN-MDC (D. Nev. Nov. 22, 2024) (ECF No. 9); *FTC v. AWS, LLC*, Case No. 2:18-cv-00442-JCM-BNW (D. Nev. Mar. 14, 2018) (ECF No. 29); *FTC v. Consumer Defense, LLC*, Case No. 2:18-cv- 00030-JCM-BNW (D. Nev. Jan. 10, 2018) (ECF No. 12); *FTC v. RevMountain, LLC*, Case No. 2:17-cv-02000-APG-GWF (D. Nev. July 25, 2017) (ECF No. 16); *FTC v. Health Formulas, LLC*, Case No. 2:14-cv-01649-JAD-GWF (D. Nev. Oct. 9, 2014) (ECF No. 12); *FTC v. Ideal Fin. Solutions, Inc.*, Case No. 2:13-cv-00143-JAD-GWF (D. Nev. Jan. 30, 2013) (ECF No. 10).

16. For the reasons states above, and as contemplated by Fed. R. of Civ. P. 65(b), there is good cause to believe that immediate and irreparable damage will result to consumers from the concealment, transfer, or destruction of Defendants' records and from the concealment or transfer of Defendants' assets if Defendants received advance notice

of the FTC's TRO Motion. Thus, it is in the interests of justice that the Court grant such application without notice to Defendants.

17. For the same reasons, there is good cause to believe that immediate and irreparable harm will result to consumers if Defendants receive premature notice of the filing of this action, as more fully set forth in the FTC's Seal Motion. For example, the FTC is aware of the following:

   a. News reporters often check district court filings for matters of interest. For example, upon information and belief, a consumer reporter for the *Los Angeles Times* has previously advised the FTC's regional office in Los Angeles that someone from the *Los Angeles Times* checks the district court filings every day for matters of interest within their "beat." It is likely that newspapers and news organizations in other cities do the same. If the file in this matter is not sealed, the fact that the FTC has filed this action may be published in a newspaper or on the Internet, and Defendants may learn of the issuance of the requested TRO before they have been served.

   b. New case filings also may come to the attention of a docket monitoring service. For example, in June 1999, the FTC filed its complaint together with an *ex parte* application for a TRO in *FTC v. Wazzue Corp.*, Case No. 8:99-cv-00762-AHS-AN (C.D. Cal. 1999). When the FTC arrived at the defendants' business premises to serve the TRO, the defendants said that they had previously learned from a monitoring service, to which their attorney subscribed, that the FTC had filed a case against them. This was later confirmed when the FTC attorneys spoke to the employee of the monitoring service who had discovered the FTC's lawsuit. The monitoring service would not have learned of the FTC's action at the time of filing if the case had been temporarily sealed.

18. Accordingly, the interests of justice will be served if the Court grants the FTC's Seal Motion to seal the case temporarily until after Defendants have been served and to do so without notice to Defendants.

I declare under penalty of perjury that the statements in this declaration are true and correct. Executed in Washington, D.C. on July 14, 2025.

*[signature]*

GREGORY A. ASHE
Counsel for Plaintiff Federal Trade Commission